**In the Matter Of:**

*USA vs*

*MARTAVIUS FREEMAN*

*2:20-cr-20058-JTF-1*

*PROCEEDING*

*August 18, 2020*



**We Bridge the State and Cover the Nation!**

www.alphareporting.com

800-556-8974

**Proceeding - August 18, 2020**

1              UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TENNESSEE
2                    WESTERN DIVISION
3 _____

UNITED STATES OF AMERICA, )
4                           )
         Plaintiff,         )
5                           )
VS.                         )    NO. 2:20-cr-20058-JTF-1
6                           )
                            )
7 MARTAVIUS FREEMAN,        )
                            )
8        Defendant.         )
9 _____

10

11              BE IT REMEMBERED, that the above-
  captioned cause came on to be heard, on this, the
12 18TH of AUGUST, 2020, beginning at approximately
  10:00 a.m., before the HONORABLE CHARMIANE E.
13 CLAXTON, Judge presiding, when and where the
  following proceedings were had, to wit:

14

15

16

17

18

19

20

21
              ALPHA REPORTING CORPORATION
22                 236 Adams Avenue
                  Memphis, TN 38103
23                  901-523-8974
                 www.alphareporting.com
24

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

2

```
 1                  A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4                      MR. GREGORY D. ALLEN
                       Assistant United States Attorney
 5                     UNITED STATES ATTORNEY'S OFFICE
                       167 North Main Street, Suite 800
 6                     Memphis, Tennessee  38103

 7

 8

 9   FOR THE DEFENDANT:

10                      MR. KAFAHNI NKRUMAH
                       Assistant Federal Public Defender
11                     FEDERAL PUBLIC DEFENDER'S OFFICE
                       200 Jefferson Avenue, Suite 200
12                     Memphis, Tennessee  38103

13

14

15

16

17

18

19

20   COURT REPORTING FIRM:

21                      ALPHA REPORTING CORPORATION
                       Lashawn Marshall, RPR, LCR #367
22                     236 Adams Avenue
                       Memphis, Tennessee 38103
23                     901-523-8974
                       www.alphareporting.com
24
```

**Proceeding - August 18, 2020**

3

1                    EXAMINATION INDEX

2   WITNESS                                              PAGE

3   DETECTIVE CHRIS KENT

4          CONTINUED CROSS BY MR. NKRUMAH. . . . . .   7
           REDIRECT BY MR. ALLEN . . . . . . . . .    36
5          RECROSS BY MR. NKRUMAH. . . . . . . . .    45

6
    DETECTIVE JOSHUA REDDING
7
           DIRECT BY MR. ALLEN . . . . . . . . . .    50
8          CROSS BY MR. NKRUMAH. . . . . . . . . .    61
           REDIRECT BY MR. ALLEN . . . . . . . . .    82
9

10

                         EXHIBIT INDEX
11
     EXHIBIT          DESCRIPTION                      PAGE
12
    EXHIBIT NO. 1  Affidavit of Complaint             19
13
    EXHIBIT NO. 2  Misdemeanor Citation for Carlos
14                 Mason                              39

15  EXHIBIT NO. 3  Advice of Rights Form and
                   Statement of Martavius Freeman     42
16

17

18    PLEASE NOTE:  All exhibits were retained by the
                    court clerk and are NOT attached.
19

20

21

22

23

24

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

4

```
 1              P R O C E E D I N G S
 2                                    10:26 a.m.
 3         THE COURT:  All right.  We are here to --
 4  all right.  We are here to continue the suppression
 5  hearing in the matter of United States versus
 6  Freeman.  We stopped in the middle of testimony from
 7  one of the government's witnesses.
 8         What did I do -- Mr. Nkrumah wanted to get
 9  some information from the United States regarding --
10  I believe it was a situation regarding some
11  recordings.
12         MR. NKRUMAH:  That is correct, Your Honor.
13         THE COURT:  All right.  And how did y'all
14  work that out?
15         MR. NKRUMAH:  Your Honor, I had a
16  conversation with AUSA Allen, Gregory -- Greg
17  Allen -- a few days after we adjourned the hearing.
18  Mr. Allen informed me that he had contacted the
19  Memphis Police Department and spoke with -- with an
20  officer who -- who spoke with another officer.
21         MR. ALLEN:  That's correct, Your Honor.
22  Essentially, the recordings do not exist.  The --
23  I've contacted Sergeant Overly (phonetic) with OCU.
24  We got in contact with an individual by the name of
```

Proceeding - August 18, 2020

5

1   John O'Connor.  This -- both of them advised that

2   these recordings are on an encrypted -- or these --

3   what he was asking for is things that are on an

4   encrypted channel, but they are not kept in the

5   recordings; that's because of the OCU's nature.

6        Sometimes they do things with Title III

7   intercepts that are under state seal, so they can't

8   violate the orders of the court.  They also deal

9   with undercover and confidential informants.  So

10  they don't keep these recordings like regular MPD

11  would, so there's nothing to obtain.

12       I can also tell the Court, as an officer

13  of the court, in my seven, eight years as a defense

14  attorney practicing here in Shelby County, I never

15  once saw these recordings.  So it's my understanding

16  they don't exist.  I followed that up with OCU who

17  said they do not exist.  So I don't think there's

18  anything to produce.

19       THE COURT:  Are you satisfied with that

20  response, Mr. Nkrumah?

21       MR. NKRUMAH:  Your Honor, after speaking

22  with Mr. Allen, I believe it would be fruitless to

23  subpoena an officer from MPD to take the stand to

24  say that these recordings don't exist.

Proceeding - August 18, 2020

6

 1          THE COURT:  Okay.

 2          MR. NKRUMAH:  We -- we're willing to

 3  stipulate that the recordings do not exist, based on

 4  Mr. Allen's investigation.

 5          THE COURT:  Okay.  So where do we want

 6  to -- do we want to continue with the officer's --

 7  first, let me -- I don't have my notes from last

 8  time, which disturbs me.

 9          MR. NKRUMAH:  We were in the middle of

10  Detective Kent's cross-examination.

11          THE COURT:  Right.  So do you want to

12  continue with him?

13          MR. NKRUMAH:  Yes, I do, Your Honor.

14          THE COURT:  All right.  Mr. Allen, if

15  you'll go get him, please.

16          (WHEREUPON, THE STENOGRAPHER REQUESTS

17  CLARIFICATION.)

18          MR. NKRUMAH:  Detective Kent, K-E-N-T.

19  And his first name -- I don't have it.

20          THE COURT:  We'll get that when he gets

21  back on the stand, then.

22          (WHEREUPON, DETECTIVE CHRIS KENT ENTERS

23  THE COURTROOM.)

24          THE COURT:  If you'll come on up,

**Proceeding - August 18, 2020**

7

```
1   Detective Kent, and resume your place at the witness

2   stand.  And you're still under oath from last

3   appearance.

4          If you would, sir -- if you would, state

5   and spell your first and last name for the record,

6   again, please.

7          THE WITNESS:  Chris Kent; C-H-R-I-S;

8   K-E-N-T.

9          THE COURT:  Thank you, sir.

10         MR. NKRUMAH:  May I continue, Your Honor?

11         THE COURT:  You may, sir.

12         MR. NKRUMAH:  Thank you.

13             DETECTIVE CHRIS KENT,

14   having been first duly sworn, was examined and

15   testified as follows:

16             CONTINUED CROSS-EXAMINATION

17   BY MR. NKRUMAH:

18     Q.    Good morning, Detective Kent.

19     A.    Good morning.

20     Q.    Just as the last time -- just like the

21   last time on August the 4th, I'm going to ask you

22   some questions this morning about the events

23   surrounding your encounter with my client,

24   Mr. Martavius Freeman, on February 2nd of 2019,
```

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

8

1   understand?

2       A.     Yes, sir.

3       Q.     If I ask you a question that you do not

4   understand, please let me know that you do not

5   understand the question.   Okay?

6       A.     Okay.

7       Q.     Is it fair to say that if you don't let me

8   know and you answer the question, that -- that I --

9   it's fair for me to assume that you would've

10  understood my question, right?

11      A.     Yes.

12      Q.     Detective Kent, when running a license

13  plate, you can contact dispatch for that

14  information, right?

15      A.     You can.

16      Q.     Okay.  And --

17          THE COURT:  And one thing I'll ask you,

18  Detective:  You can pull the mic, so if you're --

19  there you go.  So that way -- and you can pull it

20  closer to you.  Just got to make sure, with these

21  masks and everything -- and a little bit for you

22  also, Mr. Nkrumah -- you speak up a little bit more

23  or pull up the mic closer to you just to make sure

24  we can hear y'all.

Proceeding - August 18, 2020

9

 1          MR. NKRUMAH:  Yes, Your Honor.
 2          THE COURT:  Thank you, gentlemen.
 3   BY MR. NKRUMAH:
 4      Q.    And that request -- if you make it through
 5   dispatch and the response from dispatch, those
 6   items -- those -- that information would be
 7   recorded, wouldn't it?
 8      A.    I believe so.
 9      Q.    And you, Detective, on February 2nd, chose
10   to run the request through an unmonitored and
11   unrecorded line, correct?
12      A.    I didn't -- I didn't request
13   (indiscernible) information --
14          (WHEREUPON, THE STENOGRAPHER REQUESTS
15   CLARIFICATION.)
16          THE COURT:  Mr. Sowell, can we -- let's
17   see what we can do.
18          (WHEREUPON, A DISCUSSION WAS HAD OFF THE
19   RECORD, AND THEN THE PROCEEDINGS CONTINUED AS
20   FOLLOWS:)
21          THE COURT:  If you'll repeat the question,
22   Mr. Nkrumah, that'll be good.
23   BY MR. NKRUMAH:
24      Q.    And so correct me if I'm wrong, Detective,

**Proceeding - August 18, 2020**

10

1  when you requested license plates information on the

2  Altima, you requested that information through the

3  channel that was not recorded, correct?

4           (WHEREUPON, A MICROPHONE INTERRUPTION WAS

5  HAD.)

6           THE CLERK:  You want me to call IT?

7           THE COURT:  Yeah, go ahead and call IT.

8           Let's go off.

9           (WHEREUPON, A DISCUSSION WAS HAD OFF THE

10  RECORD, AND THEN THE PROCEEDINGS CONTINUED AS

11  FOLLOWS:)

12           THE COURT:  All right.  We were on -- the

13  last question was about the license check, if it was

14  through dispatch, would be recorded.  That's the

15  last thing I've got written down.

16       A.    I ran the license plate on my

17  department-issued PDA.

18  BY MR. NKRUMAH:

19       Q.    And you don't have anything to verify that

20  you, in fact, did run the license through the PDA on

21  your smartphone, do you?

22       A.    No.

23       Q.    And you were accessing the database,

24  weren't you, when you ran it through the PDA?

Proceeding - August 18, 2020

11

1      A.    Yes.

2      Q.    Detective, you consider yourself a

3   professional, don't you?

4      A.    I do.

5      Q.    And you would agree with me that there's

6   more to being a detective than just strapping on a

7   gun and a uniform, even if -- even if it's a

8   plain-clothes uniform; am I right, Detective?

9      A.    Yes.

10      Q.    And it takes certain educational

11   requirements to become a detective, doesn't it?

12      A.    To be --

13      Q.    A police officer?

14      A.    Yes.  To become a police officer, you have

15   to have -- there are certain requirements.

16      Q.    And some of -- and some of those

17   requirements are educational, correct?

18      A.    Some.

19      Q.    You have to have a high school diploma,

20   don't you?

21      A.    Yes.

22      Q.    You have to have two years of college?

23      A.    I'm not familiar with what the current

24   requirements are.

Proceeding - August 18, 2020

12

1    Q.    Okay.  But there are some educational
2  requirements.
3         I mean, you can't get this job without
4  having a high school diploma, right?
5    A.    Yes.
6    Q.    And to become -- become a detective, not
7  only do you have to reach those -- meet those
8  educational requirements, but you also go through --
9  through the police academy, right?
10   A.    That's just to become a normal police
11 officer.
12   Q.    But you've gone through the police
13 academy, right?
14   A.    Yes.
15   Q.    And once you've gone through the police
16 academy, you can get out the police academy, and you
17 have on-the-street training, correct?
18   A.    Yes.
19   Q.    And even before all of that, the
20 department gives you refresher courses on everything
21 that you learned in the academy?
22   A.    Yes.
23   Q.    And they give you refresher courses on
24 everything that you learned in on -- on-the-street

13

1  training?

2      A.    Yes.

3      Q.    And you also receive additional

4  educational training for different -- different

5  things that come up, like new techniques and the

6  sort, correct?

7      A.    Yes.

8      Q.    Okay.  I want to take you back to your

9  training in the academy for a second, and your

10  street training, but mostly in the academy.

11          One of the things they taught you in the

12  academy was the importance of filling our forms

13  correctly, wasn't it?

14      A.    Yes.

15      Q.    Completely?

16      A.    Yes.

17      Q.    And accurate, right?

18      A.    Yes.

19      Q.    And you were also taught the importance of

20  why you should form -- fill out those forms

21  accurately and completely, right?

22      A.    Yes.

23      Q.    And because being complete in your -- in

24  your reports is important because those reports may

Proceeding - August 18, 2020

14

1   be relied upon by other law enforcement officers,

2   right?

3        A.    Yes.

4        Q.    Those reports -- being complete and

5   accurate in your affidavits, right?

6        A.    Yes.

7        Q.    It's important because judges rely on

8   those affidavits, right?

9        A.    Yes.

10       Q.    And it's important to be complete and

11  accurate in your police -- police forms and your

12  affidavits because defense attorneys like me -- we

13  rely on that, right?

14       A.    Yes.

15       Q.    Detective Kent, back on the 4th of this

16  month, you testified that one of your reasons for

17  stopping the Altima was because it was speeding,

18  correct?

19       A.    Yes.

20       Q.    Westbound on Johnson Street?

21       A.    Yes.

22       Q.    And you also testified that you were

23  sitting southbound on Vandalia Street, right?

24       A.    Yes.

Proceeding - August 18, 2020

15

1    Q.    You testified that you weren't running a
2  radar that day -- that day, right?
3    A.    That's correct.
4    Q.    You also testified that you weren't using
5  any standalone radar, such as the radar that's used
6  to clock people's speed when they're going through a
7  school zone, to determine the speed of the vehicle
8  that day, right?
9    A.    That's correct.
10   Q.    On February 2, 2019, Detective, you
11 appeared before Judicial Commissioner Rhonda W.
12 Harris in the criminal court of Shelby County,
13 didn't you?
14   A.    Yes.
15   Q.    And you appeared in front of Judge Harris
16 after you had already arrested Mr. Freeman, correct?
17   A.    I did.
18   Q.    And that was after you had completed all
19 of the forms, including the affidavit of complaint,
20 correct?
21   A.    Yes.
22   Q.    And that was after you'd spoken to the
23 county prosecutor about the -- about the arrest and
24 the affidavit, correct?

Proceeding - August 18, 2020

16

1     A.    I don't remember a specific conversation

2  with the (indiscernible.)

3          (WHEREUPON, THE STENOGRAPHER REQUESTS

4  CLARIFICATION.)

5          THE COURT:  Wait just a second.  Our court

6  reporter needs a clarification.

7     A.    I don't remember a specific conversation

8  with the prosecutor -- with any prosecutor.

9          THE COURT:  Please continue, sir.

10 BY MR. NKRUMAH:

11    Q.    But you did appear in front of Judicial

12 Commissioner Harris on February the 2nd, 2019,

13 correct?

14    A.    I did.

15    Q.    And you took an oath that -- that day when

16 you appeared in front of Judge Harris, right?

17    A.    I did.

18    Q.    And you took the -- and in taking that

19 oath, you were basically stating that the facts that

20 you had in the affidavit were complete and true,

21 correct?

22    A.    Yes.

23    Q.    And also accurate, correct?

24    A.    Yes.

17

```
 1      Q.    And you also signed the affidavit
 2 attesting to the facts therein, right?
 3      A.    I did.
 4           MR. NKRUMAH:  Your Honor, I request that
 5 this -- one second, Your Honor.
 6           THE COURT:  Sure.
 7           MR. NKRUMAH:  Your Honor, at this time I
 8 request that this affidavit of complaint be marked
 9 as Exhibit Number 1 for identification.  At this
10 time, I'll show it to the prosecutor.
11           MR. ALLEN:  Judge, if we could just pass
12 it to Mr. Kent and -- Detective Kent -- make sure
13 it's the same one that he's signed, then I don't --
14           THE COURT:  That's what I was going to
15 say.  I don't know if he's identified it as being --
16           MR. ALLEN:  Right.
17           MR. NKRUMAH:  May I approach the witness?
18           THE COURT:  Absolutely, sir.
19           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
20 WAS PASSED TO THE WITNESS.)
21 BY MR. NKRUMAH:
22      Q.    That's the affidavit you signed,
23 Detective?
24      A.    It looks like a copy of it.
```

Proceeding - August 18, 2020

18

1      Q.    Detective --

2           MR. NKRUMAH:  Your Honor, I'd like to

3     identify that as Exhibit 1 for identification.

4           THE COURT:  You want it for ID, or do you

5     want to admit it?

6           MR. NKRUMAH:  Oh, I'm going to go on.

7           Oh, I'm sorry, Your Honor.  My apologies.

8           THE COURT:  That's okay.

9     BY MR. NKRUMAH:

10     Q.    Detective --

11          THE COURT:  So we're going to move its

12    admission as Exhibit 1?

13          MR. NKRUMAH:  Yes, Your Honor.

14          THE COURT:  So Mr. Sowell will need it so

15    he can put a sticker on it, then we can pass it back

16    to the witness.

17          MR. NKRUMAH:  I was going to ask him if

18    he -- if he looked the bottom of the signature and

19    if the signature was actually his to put it on the

20    record.

21          THE COURT:  Okay.  All right.  We'll go

22    ahead and do all of that.  I thought you already

23    asked him that.

24    BY MR. NKRUMAH:

Proceeding - August 18, 2020

19

1      Q.     Detective, that affidavit of complaint --

2    does it fairly and accurately reflect the original

3    affidavit of complaint that you filed with the

4    judicial commissioner on February 2, 2019?

5      A.     Yes.

6      Q.     And is that your signature at the bottom

7    of the affidavit?

8      A.     It is.

9           MR. NKRUMAH:  Your Honor, at this time I

10   move that Exhibit Number 1 be admitted for --

11   admitted as evidence.

12          THE COURT:  Any objection?

13          MR. ALLEN:  No, Your Honor.

14          THE COURT:  Without objection, the

15   affidavit of complaint will be Exhibit 1.

16          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

17   WAS MARKED AS EXHIBIT NO. 1 TO THE TESTIMONY OF THE

18   WITNESS AND WAS RETAINED BY THE COURT CLERK.)

19   BY MR. NKRUMAH:

20     Q.     Detective, back on February 2nd, didn't

21   you swear in your affidavit -- one second.  My

22   apologies.

23          Detective, on February 2, 2019, didn't

24   you -- in front of Judge Harris, didn't you swear in

**Alpha Reporting Corporation**

20

1   your affidavit that -- didn't you swear in your

2   affidavit about the direction of the Altima?

3       A.    I did.

4       Q.    And in that affidavit, you stated, on

5   two -- in that affidavit, I'm looking at the second

6   paragraph, full paragraph, starting with "on

7   2/2/2019."  Do you see it, Detective?

8       A.    Yes, sir.

9       Q.    And in your affidavit, you stated:  On

10  2/2/2019 at 16:50 hours, Detectives C. Kent and

11  J. Redding observed a gray Nissan Altima eastbound

12  on Hale Road traveling approximately 45 miles per

13  hour in a 25-mile-per-hour zone.

14          That's what's in your affidavit, correct?

15      A.    It is.

16      Q.    And that's not the testimony that you gave

17  here the other day, is it?

18      A.    It's not.

19      Q.    You also testified about the speed that

20  the vehicle was going, correct?

21      A.    I did.

22      Q.    And you weren't able to ascertain the

23  speed that the vehicle was going on that day, right?

24      A.    Not the exact speed.

Proceeding - August 18, 2020

21

1    Q.    Not the exact speed.

2          So when you put 45 miles -- 45 in a

3  25-mile-per-hour zone in your affidavit, that was

4  just -- that was a number that you just put in the

5  affidavit, right?

6    A.    No.  That was the approximate speed that I

7  observed the vehicle going.

8    Q.    And you observed that with your plain

9  eyesight, correct?

10   A.    Yes, sir.

11   Q.    On February 2nd -- that day at 16:50

12 hours, that's in the wintertime, isn't it?

13 February.

14   A.    I guess.

15   Q.    It's a winter month, right?

16   A.    Yes.

17   Q.    And about 4:50, 5:00, it's getting dark at

18 that time, isn't it?

19   A.    I'm not sure what time the sun sets in

20 February.

21   Q.    Okay.  But you would agree with me that it

22 gets dark early in the wintertime, correct?

23   A.    The sun does go down earlier in the

24 wintertime, yes.

Proceeding - August 18, 2020

22

1    Q.    Okay.  And so -- so again, you -- your

2  testimony is that you were able to observe and -- as

3  the sun was going down, this vehicle coming down

4  Johnson Street traveling at 45 miles an hour, right?

5    A.    Approximately.

6    Q.    Approximately.

7          And you were able to do that with just

8  plain eyesight, right?

9    A.    Yes.

10    Q.    And to your knowledge, Detective,

11  Mr. Mason, the driver of the Nissan -- he wasn't

12  issued a citation for speeding, right?

13    A.    Not for speeding.

14    Q.    And to your knowledge -- and other than

15  your word, Detective, there's nothing that indicate

16  how -- there's nothing that would -- that would

17  corroborate your indication that he was traveling at

18  45 miles per hour, right?

19    A.    Not to my knowledge.

20    Q.    You also testified on direct, Detective,

21  that the driver of the Nissan made two turns without

22  signaling, right?

23    A.    I did.

24    Q.    And that was another reason that you gave

23

1  for stopping the Altima, wasn't it?

2      A.    Yes.

3      Q.    And like the reason about the speeding,

4  you didn't notify dispatch that you were making a

5  traffic stop, right?

6      A.    No.

7      Q.    And just like the speeding, there's no --

8  there was no dashcam recording of this stop, right?

9      A.    There is not.

10     Q.    And there -- and there was no body cam

11  recording of the stop, either, right?

12     A.    There's not.

13     Q.    As a matter of fact, the organized crime

14  unit -- y'all don't wear body cam, right?

15     A.    We did not at that time.

16     Q.    You did not at that time.

17           And -- but at that time, it was a -- even

18  though it was a -- even though it was a department

19  policy that officers wear body cam, your unit wasn't

20  wearing body cam at that time, right?

21     A.    It was a policy for uniform patrol.

22     Q.    The same thing for vehicle -- department

23  vehicles; they have to have dashcams on -- in the

24  vehicles, correct?

Proceeding - August 18, 2020

24

1      A.    I don't know that they had to have them.

2      Q.    But at that time, the Memphis Police

3 Department was issuing dashcams for all of the

4 vehicles, correct?

5      A.    (Indiscernible) marked patrol cars, yes.

6           (WHEREUPON, THE STENOGRAPHER REQUESTS

7 CLARIFICATION.)

8      A.    To marked patrol cars.

9 BY MR. NKRUMAH:

10     Q.    So there's no dashcam recording of these

11 violations of no turn signals, right?

12     A.    There is no dashcam footage.

13     Q.    And there's no body-cam footage of it,

14 either, right?

15     A.    There's no body-cam footage.

16     Q.    And there's no ticket for Mr. -- to

17 Mr. Mason for -- for making a turn with no signals,

18 right, to your knowledge?

19     A.    There's no ticket for speeding.

20     Q.    And there's no ticket for -- Detective,

21 you didn't issue Carlos Mason a ticket for speeding,

22 do you -- did you?

23     A.    No.

24     Q.    Nor did you issue him a ticket for failure

Proceeding - August 18, 2020

25

```
 1   to signal during a turn, did you?
 2        A.    I don't believe so.  I'm not sure.
 3             MR. NKRUMAH:  One moment, Your Honor.
 4             Your Honor, may I approach the witness?
 5             THE COURT:  Yes, sir.
 6             (WHEREUPON, A DOCUMENT WAS PASSED TO THE
 7   WITNESS.)
 8   BY MR. NKRUMAH:
 9        Q.    Detective, could you read that document to
10   yourself, please?
11        A.    I have.
12        Q.    Does that document help refresh your
13   memory?
14        A.    It does.
15        Q.    May I have it back, please?
16             Detective, you didn't issue a ticket for
17   failure to use signals while turning, correct?
18        A.    I did not.
19        Q.    You also testified that neither Mr. Mason
20   nor Mr. Freeman were wearing seat belts, right?
21        A.    That's correct.
22        Q.    And that was another reason for you
23   stopping the vehicle?
24        A.    Yes.
```

Proceeding - August 18, 2020

26

1    Q.    Just as -- just as all the rest of the

2  reasons that you've given:  You didn't contact

3  dispatch regarding this stop, right?

4    A.    I did not.

5    Q.    You didn't contact dispatch regarding the

6  fact that you were stopping a vehicle for the

7  occupants' failure to wear the seat belts, correct?

8    A.    Correct.

9    Q.    You didn't body cam it?  There's no

10  body-cam footage of them not wearing the seat belts?

11    A.    There is no body-cam footage.

12    Q.    And no cam -- no dashcam recording,

13  either?

14    A.    There's no dashcam recording.

15    Q.    Okay.  At some point after the stop of the

16  vehicle, you detained Mr. Freeman in the vehicle for

17  a short period of time, correct?

18    A.    I'm sorry; I didn't hear you.

19    Q.    After the -- after you and your partner

20  stopped the vehicle, y'all detained Mr. Freeman and

21  Mr. Mason in the vehicle?

22    A.    In our vehicle?

23    Q.    No.

24        Strike that; I'm sorry.

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

27

1          After stopping the vehicle, you and your
2    partner approached the vehicle that Mr. Mason and
3    Mr. Freeman were in, correct?
4        A.    Yes.
5        Q.    You approached on the passenger side?
6        A.    I did.
7        Q.    And your partner on the driver side?
8        A.    Yes.
9        Q.    And you stated -- you testified on the 4th
10   that your partner began talking to Mr. Mason,
11   correct?
12       A.    He did.
13       Q.    And you could overhear that conversation,
14   correct?
15       A.    Yes.
16       Q.    And this was at the same time while you
17   were speaking to Mr. Freeman, correct?
18       A.    Yes.
19       Q.    And you were both -- and you and your
20   partner were questioning Mr. -- questioning
21   Mr. Mason and Mr. Freeman, correct?
22       A.    We were asking them questions, if that's
23   what you mean.
24       Q.    You were asking them questions, right?

Proceeding - August 18, 2020

28

1    A.    Yes.

2    Q.    And you were asking them questions like

3  where were they coming from?

4    A.    I don't remember if that was one of the

5  questions.

6    Q.    What were they doing, where they were

7  going?

8    A.    I'm sure (indiscernible) --

9         (WHEREUPON, THE STENOGRAPHER REQUESTS

10  CLARIFICATION.)

11    A.    I'm sure those were some of the questions

12  we asked.

13  BY MR. NKRUMAH:

14    Q.    Your partner also asked Mr. Mason if there

15  was anything in the vehicle, right?

16    A.    I believe so, yes.

17    Q.    And after asking Mr. Mason if there was

18  anything in the vehicle, Mr. Mason stated that there

19  was, that he had some marijuana, correct?

20    A.    Yes.

21    Q.    And at that time, your partner took

22  Mr. Mason out of the vehicle, correct?

23    A.    He did.

24    Q.    And Mr. Mason actually showed your partner

Proceeding - August 18, 2020

29

1   where the marijuana was in the vehicle, correct?

2       A.    I believe he pointed to it.

3       Q.    In the middle console, correct?

4       A.    Yes.

5       Q.    And Mr. Mason claimed that that was his,

6   correct?

7       A.    Yes.

8       Q.    So at that point, your partner arrested

9   Mr. Mason for the marijuana, correct?

10      A.    Yes.

11      Q.    And after arresting Mr. Mason -- while

12  this was going on, Mr. Freeman was still sitting in

13  the vehicle, wasn't he?

14      A.    He was.

15      Q.    And while sitting in the vehicle, you were

16  still talking to Mr. Freeman, right?

17      A.    I was.

18      Q.    You were still questioning Mr. Freeman?

19      A.    Yes.

20      Q.    Okay.  And Mr. Freeman wasn't the driver,

21  was he?

22      A.    He was not.

23      Q.    Okay.  So after questioning Mr. Freeman --

24  after questioning Mr. Freeman, you decided to take

Proceeding - August 18, 2020

30

1   Mr. Freeman out of the vehicle, correct?

2       A.    Yes.

3       Q.    Now, at this time, Mr. Freeman had not

4   committed any traffic violations, did he?

5       A.    He wasn't wearing his seat belt.

6       Q.    Based on your testimony, right?

7       A.    Yes.

8       Q.    Okay.  Other than not wearing a seat belt,

9   he hadn't committed any other crimes, to your

10  knowledge, right?

11      A.    Not to my knowledge.

12      Q.    Okay.  But you took Mr. Mason out of the

13  vehicle?

14      A.    I did.

15      Q.    And you detained him in your vehicle,

16  correct?

17      A.    I did.

18      Q.    And after detaining Mr. Mason in the

19  vehicle, you searched the vehicle?

20      A.    Yes.

21      Q.    Now, this search -- it occurred shortly

22  after the stop, correct?

23      A.    Yes.

24      Q.    Can I say about -- within three to five

Proceeding - August 18, 2020

31

1    minutes after the stop?

2        A.    I think that's fair.

3        Q.    Okay.  And you began searching the

4    vehicle.

5            Now, Mr. Freeman was in the vehicle, and

6    Mr. Mason was detained in your vehicle also, right?

7        A.    They were both detained in our squad car,

8    yes.

9        Q.    Okay.  And you conducted the search,

10   correct?

11       A.    I searched one side; my partner searched

12   the other side.

13       Q.    Okay.  You searched the passenger side?

14       A.    Yes.

15       Q.    And your partner searched the driver side?

16       A.    Yes.

17       Q.    And after searching the passenger side,

18   you found contraband, correct?

19       A.    What I believe to be contraband.

20       Q.    What you believe to be contraband.

21           Okay.  After finding that contraband, you

22   spoke to both Mr. Mason and Mr. Freeman, correct?

23       A.    Yes.

24       Q.    And they both denied that the contraband

Proceeding - August 18, 2020

32

1   belonged to them, correct?

2       A.    No.

3       Q.    At that time, someone admitted that the

4   contraband that you found in the vehicle belonged to

5   them?

6       A.    After we found the contraband, we hadn't

7   changed locations to our office at

8   (indiscernible) --

9           (WHEREUPON, THE STENOGRAPHER REQUESTS

10  CLARIFICATION.)

11          THE WITNESS:  I'm sorry.

12      A.    We changed locations to our office at 51

13  South Flicker Street where we Mirandized both

14  Mr. Freeman and Mr. Mason.  At which point,

15  Mr. Freeman claimed the contraband that I located in

16  the rear floorboard of the passenger side of the

17  vehicle.

18      Q.    So after finding the contraband, you

19  arrested both Mr. Freeman and Mr. Mason, correct?

20      A.    Yes.

21      Q.    And you took them down to your precinct,

22  correct?

23      A.    Yes.

24      Q.    And after taking them to the precinct, you

Proceeding - August 18, 2020

33

1    Mirandized both of them, correct?

2        A.    I did not Mirandize Mr. Mason myself, but

3    I -- myself and my partner Mirandized Mr. Freeman.

4        Q.    Your partner and yourself Mirandized

5    Mr. Freeman?

6        A.    Yes.

7        Q.    And after Mirandizing Mr. Freeman, at

8    first Mr. Freeman denied that the contraband was

9    his, correct?

10       A.    I don't think so.

11       Q.    And then after that, you went to go speak

12   with Mr. Mason; isn't that true?

13       A.    I don't remember ever speaking with

14   Mr. Mason.

15       Q.    And after coming back -- after speaking

16   with Mr. Mason, that's when my client allegedly gave

17   his statement, correct?

18       A.    I don't remember ever speaking with

19   Mr. Mason.

20       Q.    Maybe your partner did?

21       A.    We had two other partners who I believe

22   were speaking with Mr. Mason.

23       Q.    Okay.  Okay.  So then -- okay.  So -- so

24   you and your partner was speaking with Mr. Freeman?

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

34

1      A.    Yes.

2      Q.    And two other detectives were speaking

3   with Mr. Mason?

4      A.    Yes.

5      Q.    Now, all of this occurred shortly after --

6   all of this occurred within a short period of time

7   after the -- after the initial stop, wouldn't you

8   agree?

9      A.    I guess it depends on your definition of

10  "short."

11     Q.    I'll say like a hour maybe.  Between the

12  stop, the search, the transport to the station, and

13  the interrogation, about an hour, right?

14     A.    Approximately.

15     Q.    Approximately a hour, maybe a little less?

16     A.    Well, the interview of Mr. Mason may have

17  gone longer than the hour, but I think we were

18  probably on our way to our office within an hour of

19  the traffic stop, and possibly beginning

20  (indiscernible) --

21          (WHEREUPON, THE STENOGRAPHER REQUESTS

22  CLARIFICATION.)

23     A.    And possibly beginning the interview

24  within an hour of that traffic stop.

**Alpha Reporting Corporation**

35

1          (WHEREUPON, A DISCUSSION WAS HAD WITH THE

2     STENOGRAPHER OFF THE RECORD, AND THEN THE

3     PROCEEDINGS CONTINUED AS FOLLOWS:)

4          MR. NKRUMAH:  Can I ask the court reporter

5     to please repeat the last question and answer?

6          (WHEREUPON, THE REPORTER READS BACK THE

7     REQUESTED PORTION.)

8     BY MR. NKRUMAH:

9       Q.    With the interview of Mr. Freeman, would

10    you agree with me, Detective, that the -- that

11    the -- from the moment of the stop until the time

12    that Mr. Freeman gave his statement, maybe an hour

13    and a half had passed?

14      A.    Until we -- I guess.  I don't -- I don't

15    really remember the exact time frame.

16      Q.    But it wasn't a lengthy period of time,

17    right?

18      A.    No.

19      Q.    It wasn't five, six hours which had

20    passed, right?

21      A.    No.

22      Q.    You didn't have to go back and forth with

23    Mr. Freeman and fight with him about it's yours, and

24    it's not yours.  You didn't have to do that with

Proceeding - August 18, 2020

36

1   Mr. Freeman, right?

2       A.    No, we did not.

3       Q.    He -- not soon after he had been

4   transported to the station by you, he confessed to

5   the possession of the contraband, correct?

6       A.    Yes.

7           MR. NKRUMAH:  No further questions, Your

8   Honor.

9           THE COURT:  Any redirect?

10          MR. ALLEN:  Yes, Your Honor.

11          Your Honor, if I may approach the witness?

12          THE COURT:  You may.

13          (WHEREUPON, A DOCUMENT WAS PASSED TO THE

14  WITNESS.)

15                  REDIRECT EXAMINATION

16  BY MR. ALLEN:

17      Q.    Detective Kent, you were asked a couple

18  questions earlier regarding a citation issued to the

19  driver Carlos Mason.  Do you recall those questions?

20      A.    Yes.

21      Q.    You were asked if you issued a citation to

22  Mr. Mason for speeding or a turn violation.  Do you

23  recall that?

24      A.    I do.

Proceeding - August 18, 2020

37

1     Q.    Those weren't included in your citation,
2  but you did charge him with several other things,
3  right?

4     A.    I did.

5     Q.    You charged him with vehicle registration
6  violation?

7     A.    Yes.

8     Q.    And seat belt?

9     A.    Yes.

10    Q.    Marijuana?

11         MR. NKRUMAH:  Objection, Your Honor;
12  leading.

13         MR. ALLEN:  I can rephrase.

14         THE COURT:  Rephrase, please.

15  BY MR. ALLEN:

16    Q.    If -- tell us what you recall actually
17  charging Mr. Mason with.

18    A.    Violation of vehicle registration.

19         MR. NKRUMAH:  Objection, Your Honor.  He's
20  reading from the document.

21  BY MR. ALLEN:

22    Q.    If you recall.  If you need to refresh
23  your recollection, I can -- do you recall what you
24  charged Mr. Mason with?

Proceeding - August 18, 2020

38

1      A.    Yes.

2      Q.    Tell the Court.

3      A.    Violation of vehicle registration law;

4  violation of seat belt law; driving while license

5  suspended, revoked, or canceled; and possession of

6  marijuana.

7      Q.    Okay.  Is it common in your experience,

8  when you have charges that are more severe than

9  certain traffic violations, that you don't always

10 charge the lesser offenses such as speeding?

11     A.    Yes.

12     Q.    In your experience, is that kind of just

13 piling on?

14     A.    Yes.

15     Q.    In this case, if you recall, do -- tell

16 the Court why you chose not to charge the driver

17 with the speeding or turn violations.

18     A.    Because we had more serious charges.

19     Q.    Okay.

20         MR. ALLEN:  Your Honor, at this time, I'd

21 like to introduce that misdemeanor citation for

22 Carlos Mason into evidence.

23         THE COURT:  Any objection?

24         MR. NKRUMAH:  No objection, Your Honor.

Proceeding - August 18, 2020

39

1           THE COURT:  All right.  Without objection,
2   that will be Exhibit 2.
3           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
4   WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF THE
5   WITNESS AND WAS RETAINED BY THE COURT CLERK.)
6           THE COURT:  Do we have -- is that
7   Exhibit 1?  That's the affidavit of complaint.
8           All right.
9   BY MR. ALLEN:
10     Q.    Regarding the affidavit of complaint, you
11  were asked if you placed "east" in the affidavit on
12  Hale Road.  Do you recall that conversation with the
13  defense attorney a few minutes ago?
14     A.    I do.
15     Q.    Your testimony originally that was -- the
16  vehicle was traveling actually westbound on what
17  street?
18     A.    On Johnson.
19     Q.    Does Hale and Johnson overlap?  And what I
20  mean by that is, do the -- does Hale Road become
21  Johnson or Johnson become Hale at some point?
22     A.    It does.
23     Q.    Okay.  And what, if anything, do you
24  recall about placing the direction of the vehicle in

Proceeding - August 18, 2020

40

1  the affidavit regarding the affidavit of complaint?

2          And what I mean by that is, what was your

3  intention of placing the direction of the vehicle in

4  that affidavit to go before the magistrate or the

5  judicial commissioner?

6          MR. NKRUMAH:  Objection, Your Honor;

7  compound question -- questions.

8          THE COURT:  Rephrase, please.

9  BY MR. ALLEN:

10     Q.    When you placed the direction of the

11  vehicle in the affidavit of complaint, what, if

12  anything, was your intention to the judicial

13  commissioner?

14     A.    My intention was to put that the vehicle

15  was traveling west, but I made -- I mistyped and put

16  "east."

17     Q.    So it's a typographical error?

18     A.    Yes.

19     Q.    You weren't trying to mislead the

20  commissioner?

21     A.    No.

22     Q.    And next, regarding the affidavit of

23  complaint and the miles per hour that were listed --

24  I want to direct you to that.  Okay?

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

41

1        Is that based on your training and
2  experience as a police officer?
3        A.    Yes.
4        Q.    And you put "approximately" in the
5  affidavit, correct?
6        A.    Yes.
7        Q.    And is that because you were trying to be
8  as accurate as possible to the commissioner?
9        A.    Yes.
10       Q.    Okay.  Do you recall your partner pacing
11  the vehicle prior to the traffic stop?
12       A.    I believe he did, yes.
13       Q.    Okay.  Next, I want to direct your
14  attention to the document in front of you.  I'd ask
15  you to take a second or two.  Flip through that and
16  see if you recognize that.
17       A.    I recognize it.
18       Q.    If you would, place it face down.
19       What is that document that you have in
20  front of you?
21       A.    That's the written statement that
22  Mr. Freeman gave myself and my partner.
23       Q.    After you conducted this traffic stop for
24  multiple traffic violations and changed locations,

**42**

1  is that when you administered Mr. Freeman his advice

2  of rights?

3       A.    Yes.

4       Q.    And did he appear to understand those?

5       A.    He did.

6       Q.    And did he acknowledge that, in a written

7  waiver of those rights, before providing a statement

8  to you?

9       A.    He did.

10           MR. ALLEN:  Your Honor, I'd ask that that

11  be marked as the next exhibit.  It's the advice of

12  rights and statement by Mr. Freeman in this case.

13           THE COURT:  Any objection?

14           MR. NKRUMAH:  No objection, Your Honor.

15           THE COURT:  All right.  Without objection,

16  the advice of rights form and statement will be

17  Collective Exhibit 3.

18           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENTS

19  WERE MARKED AS EXHIBIT NO. 3 TO THE TESTIMONY OF THE

20  WITNESS AND WERE RETAINED BY THE COURT CLERK.)

21  BY MR. ALLEN:

22       Q.    And Detective Kent, you were asked a

23  number of questions regarding body camera and

24  recordings and dashcams and dispatch proceedings.  I

43

1   want to direct you to that.  Okay?

2       A.    Okay.

3       Q.    You are a detective or officer with the

4   Memphis Police Department, correct?

5       A.    Yes.

6       Q.    You're not an expert in communications or

7   recordings or dispatch proceedings, are you?

8       A.    I'm not.

9       Q.    But you do your best to comply with

10  department policy?

11      A.    Yes.

12      Q.    And you don't know the -- all the

13  interworkings of OCU's recordings at that time, did

14  you?

15      A.    I do not.

16      Q.    And is it common practice, when you

17  conduct a traffic stop at the time of this, February

18  2019 -- was it your common practice to dispatch or

19  contact, on your radio, if you had a traffic stop

20  occurring?

21      A.    Yes.

22      Q.    But you wouldn't always broadcast over the

23  recordings your basis for the traffic stop, correct?

24      A.    No.

44

1          MR. NKRUMAH:  Objection.

2          THE COURT:  What's your basis of your

3   objection?

4          MR. NKRUMAH:  Leading, Your Honor.

5          THE COURT:  Please watch your leading,

6   Mr. Allen.

7          MR. ALLEN:  Thank you.

8   BY MR. ALLEN:

9     Q.    Let's do this:  Tell the Court what you --

10   in a traffic-stop situation -- what would be your

11   normal practice for broadcasting over your

12   communications.

13    A.    Just the location and a brief description

14   of the vehicle.

15    Q.    And then at the conclusion of the traffic

16   stop, what would be your -- what, if anything, would

17   you send back out?

18    A.    A very brief conclusion or a very brief

19   summary of what happened on the traffic stop,

20   whether we advised someone or issued them a citation

21   or arrested someone, something like that.

22    Q.    So is it fair to say that you would not

23   broadcast out, "I stopped X vehicle for X reason and

24   then did this," whether it's arresting them, let

Proceeding - August 18, 2020

45

1  this person go, or anything of that nature?

2      A.    It is fair to say that.

3      Q.    Okay.  But would it also be fair to say a

4  traffic stop of a described vehicle and then number

5  of people in custody?

6      A.    Yes.

7      Q.    Okay.  Do you recall, in this specific

8  situation, what you did?

9      A.    I don't recall in this specific situation.

10     Q.    Okay.  Lastly, with the observation of

11  seat belts, I want to direct you to that.

12           From where you were sitting, how certain

13  are you that both the driver and Mr. Freeman did not

14  have a seat belt on?

15     A.    Very certain.

16           MR. ALLEN:  No further questions, Your

17  Honor.

18           THE COURT:  All right.  Thank you,

19  Detective.

20           MR. NKRUMAH:  Briefly, Your Honor?

21           THE COURT:  All right.

22                RECROSS-EXAMINATION

23  BY MR. NKRUMAH:

24     Q.    Detective Kent, you just was asked about

Proceeding - August 18, 2020

46

1  what your normal -- what your common practice is

2  when stopping a vehicle, correct?

3      A.    Yes.

4      Q.    And you indicated that it was common

5  practice to contact dispatch, right?

6      A.    Yes.

7      Q.    But you didn't contact dispatch this time,

8  right?

9      A.    I don't remember exactly what happened.

10     Q.    You also indicated that it was common

11 practice to give your location and a brief

12 description of the vehicle, correct?

13     A.    Yes.

14     Q.    But you didn't do that this time, either,

15 did you?

16     A.    Well, I would have done it on my team --

17 the frequency that my team worked off of.

18     Q.    But you didn't contact dispatch and give

19 that information, did you, Detective?

20     A.    I don't believe that I did.

21     Q.    You also -- you also testified and AUSA

22 Allen asked you about pacing vehicles, correct?

23     A.    Yes.

24     Q.    You stated that your -- that your partner

47

1  was pacing the vehicle, correct?

2      A.    I stated I believed he did.

3      Q.    You believe he did.

4            Detective, it's extremely difficult to

5  pace a vehicle on a city street, correct?

6      A.    No.

7      Q.    When pacing a vehicle, you have to

8  maintain a certain distance, correct?

9      A.    Yes.

10     Q.    Now, you -- now, you -- now, when you

11 pulled out to follow this Altima, what -- you were

12 about half a car length behind him?  A car length?

13     A.    I don't remember the exact distance.

14     Q.    But you stayed close to the vehicle,

15 correct?

16     A.    We stayed a reasonable distance.

17     Q.    A reasonable distance so you can see the

18 vehicle, and you can turn when the vehicle turns,

19 correct?

20     A.    Yes.

21     Q.    Detective, you can't pace a vehicle on a

22 city street, can you?

23     A.    You can.

24     Q.    You need -- not only in pacing the

Proceeding - August 18, 2020

48

1    vehicle, you need distance, right?

2        A.    You need some distance.

3        Q.    You need -- you need distance between you

4    and the vehicle, correct?

5        A.    You need some distance between you and the

6    vehicle.

7        Q.    But some distance -- Detective, are we

8    talking like a quarter of a foot, one car length,

9    seven car lengths?

10       A.    A car length maybe.

11       Q.    Maybe a car length.

12             You testified that you've been a detective

13   for five years, right?

14       A.    I've been a police officer for five and a

15   half years.

16       Q.    You have been a police officer for five

17   and a half years, and you testified that part of

18   your training was speed enforcement, correct?

19       A.    Yes.

20       Q.    You testified that OCU -- that was one of

21   their regular duties, correct?

22       A.    Yes.

23       Q.    But you can't tell me how far of a

24   distance you need in order to pace a vehicle,

Proceeding - August 18, 2020

49

1   Detective?

2           MR. NKRUMAH:  No further questions.

3           THE COURT:  Mr. -- Detective, do you wish

4   to answer the final question?

5           MR. ALLEN:  Your Honor, I was going to say

6   he didn't give him a chance.  And I believe it's

7   asked and answered.  He said "a reasonable distance"

8   several times.

9           THE COURT:  Well, we'll let it stand as

10  that.

11          Thank you, Detective.

12          Well --

13          MR. NKRUMAH:  Do you have a answer for

14  that question?

15          THE COURT:  Well, I think he just did.  I

16  asked him if he did.  I think he indicated he

17  didn't.

18          Is this going to be the last question?

19          MR. ALLEN:  No.  I was --

20          THE COURT:  Call the next witness.

21          Thank you, Detective.  You're free to step

22  down.

23          THE WITNESS:  (Complying with request.)

24          (WHEREUPON, DETECTIVE JOSHUA REDDING

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

50

```
 1   ENTERS THE COURTROOM.)
 2          THE COURT:  Stand right there.
 3          (WHEREUPON, DETECTIVE JOSHUA REDDING WAS
 4   DULY SWORN.)
 5          THE COURT:  Take our modified witness
 6   stand, sir.  And after you're seated and
 7   comfortable, if you'll state and spell your first
 8   and last name for the record.  You can actually move
 9   that mic stand closer to you if you need to.  Got to
10   make sure we can hear you and understand what you're
11   saying.
12          THE WITNESS:  First name is Joshua,
13   J-O-S-H-U-A; last name is Redding, R-E-D-D-I-N-G.
14          THE COURT:  Thank you, sir.
15          DETECTIVE JOSHUA REDDING,
16   having been first duly sworn, was examined and
17   testified as follows:
18                DIRECT EXAMINATION
19   BY MR. ALLEN:
20      Q.    Mr. Redding, what's your current
21   occupation?
22      A.    I'm a police officer for the City of
23   Memphis.
24      Q.    Okay.  And how long have you been with
```

Proceeding - August 18, 2020

51

```
 1  MPD?

 2       A.    Approximately five years

 3       Q.    In February of 2019, what was your title?

 4       A.    I worked for organized crime.

 5       Q.    Is that part of Memphis Police Department?

 6       A.    Yes, it is.

 7       Q.    And were you a detective then?

 8       A.    Yes, I was.

 9       Q.    Okay.  I want to direct your attention.

10  Well, you said over five years as a --

11       A.    No, it's coming up on five years.

12       Q.    Coming on up five years with Memphis

13  Police Department?

14       A.    Yes, sir.

15       Q.    During the course of that five years, best

16  guess:  How many traffic stops you think you've

17  participated in?

18       A.    Hundreds, if not thousands.

19       Q.    Okay.  On February 2, 2019 -- I want to

20  direct your attention to that date.  You were

21  employed with organized crime with the Memphis

22  Police Department at that time?

23       A.    Yes, sir.

24       Q.    Do you recall a traffic stop involving a
```

**Alpha Reporting Corporation**

Proceeding - August 18, 2020

52

1   Martavius Freeman?

2       A.    Yes, sir.

3       Q.    I'll ask you to look around the courtroom

4   and see if you can identify the individual that you

5   stopped that night as Martavius Freeman.

6       A.    Yes, sir.

7       Q.    Can you point to something he's wearing

8   and describe it for the record?

9       A.    A brown shirt.

10      Q.    Is this the individual you're pointing to?

11      A.    Yes, sir.

12          MR. ALLEN:  Your Honor, I'd ask that the

13  record reflects he's identified Mr. Freeman.

14          THE COURT:  The record will so reflect.

15          MR. ALLEN:  Thank you.

16  BY MR. ALLEN:

17      Q.    Let's go back to that night and talk about

18  the traffic stop.  Okay?

19          Where were you located?  Where were you

20  sitting in the vehicle, or what were you doing at

21  the time?  Just tell us that.

22      A.    I was driving the vehicle.

23      Q.    Okay.  Where were you?

24      A.    We were sitting at the intersection of

Proceeding - August 18, 2020

53

1    Vandalia and Johnson.

2        Q.    Okay.  And you say "we."  Who was with

3    you?

4        A.    Detective Kent.

5        Q.    Okay.  And was that your partner at that

6    time?

7        A.    Yes, sir, at that time.

8        Q.    And were y'all in separate vehicles?

9    Y'all in one vehicle?

10       A.    Same vehicle.

11       Q.    Same vehicle?

12       A.    Yes, sir.

13       Q.    Okay.  How did you encounter Mr. Freeman

14   first?

15       A.    A vehicle came up from our left-hand side,

16   traveling westbound on Johnson.  The driver and the

17   passenger were not wearing seat belts.  The vehicle

18   appeared to be going beyond the speed limit.

19       Q.    Okay.

20       A.    We pulled behind it and attempted to pace

21   the vehicle.  The vehicle showed to be going around

22   45 in a 25.  They made two turns without utilizing a

23   signal.  And while behind the vehicle, we ran the

24   tags.  The tags showed to come back to a different

Proceeding - August 18, 2020

54

1  make of a vehicle.

2      Q.    Okay.  Let me break that down a little

3  bit.

4            Where was Mr. Freeman in this vehicle when

5  you saw?

6      A.    Passenger seat.

7      Q.    Okay.  And you said Mr. Freeman was not

8  wearing a seat belt?

9      A.    He was not.

10     Q.    Okay.  And the driver was not wearing a

11  seat belt?

12     A.    Neither of them appeared to be.

13     Q.    How certain are you that either one of

14  those individuals was not wearing a seat belt?

15     A.    Hundred percent.

16     Q.    Okay.  After you see this vehicle drive

17  by, do you recall the -- what -- the make and model

18  of the vehicle?

19     A.    I believe it was a silver Nissan Altima, I

20  believe.

21     Q.    Okay.  So the -- you see this car drive by

22  with two people not wearing a seat belt.  And at

23  that point, do you believe that it's traveling above

24  the speed limit?

Proceeding - August 18, 2020

55

1        A.    Yes, sir.

2        Q.    Is that based on your training,

3    experience, or how do you -- how do you know that?

4        A.    Both.

5        Q.    Both?

6        A.    Training and experience, yes, sir.

7        Q.    Okay.  So what do you do after that?

8        A.    We get behind the vehicle.

9        Q.    Okay.  And you're driving?

10       A.    Yes, sir.

11       Q.    Is that when you attempted to pace the

12   vehicle?

13       A.    Yes, sir.

14       Q.    What -- what, if anything, did you do that

15   led you to believe the vehicle was speeding?

16       A.    So we caught up to the vehicle and

17   attempted to match the vehicle's speed.  That way,

18   we were traveling the same speed as the vehicle,

19   where our speed would be -- would be the same speed,

20   roughly, that the vehicle was traveling.

21       Q.    And did you have to exceed the speed limit

22   to do that?

23       A.    Yes, sir.

24       Q.    Okay.  And then the vehicle made a left

Proceeding - August 18, 2020

56

1   turn?

2       A.    Yes, sir, left-hand turn.

3       Q.    Okay.  At what point do you become aware

4   that the tags on the vehicle do not match the

5   vehicle that is being driven?

6       A.    While I was -- while I was pacing the

7   vehicle, my partner was running the vehicle's

8   registration.  He informed me that the vehicle's

9   registration came back to a different vehicle.

10      Q.    Okay.  And then your next step is the

11  traffic stop?

12      A.    Yes, sir.

13      Q.    At what point do you activate your blue

14  lights?

15      A.    We were on Crystal at the time.  We had

16  just turned onto Crystal from Gracewood.  We

17  initiated blue lights after my partner had told me

18  that the tags belonged to a different vehicle.

19      Q.    Okay.  And after you initiate the blue

20  lights, what does the vehicle do?

21      A.    Pulled over and stops.

22      Q.    Okay.  And then what do you do?

23      A.    I go up, make contact with the driver.

24      Q.    Who was the driver?

Proceeding - August 18, 2020

57

1      A.    Mr. Mason.

2      Q.    Okay.

3      A.    Carlos Mason was his name.

4      Q.    And what, if anything, do you say to

5  Mr. Mason?

6      A.    I go up.  I ask him if there's anything in

7  the vehicle that we need to know about.  He advised

8  me the only thing in the vehicle was a little bit of

9  marijuana.

10      Q.    A little bit of marijuana?

11      A.    Yes, sir.

12      Q.    At that point, based on your training and

13  experience, what is your next step?

14      A.    Next step is to get him identified.  I ran

15  him on our PDA, and Mr. Mason showed to have an

16  active warrant, per MCIC.

17      Q.    Okay.

18      A.    We then had him step out of the vehicle,

19  and we detained him in the rear of our squad car.

20      Q.    Based on your training and experience,

21  after you discovered marijuana, what do you -- what

22  can you do now?

23      A.    Check for further narcotics.

24      Q.    So at that point, once Mr. Mason says

58

1  there's marijuana in the car, you detain him.  You

2  plan to search the vehicle for further narcotics?

3      A.    Yes, sir.

4      Q.    Okay.  And your discussions are with

5  Mr. Mason only, correct?

6      A.    Yes.

7      Q.    What, if anything, do you recall your

8  partner doing at this time?

9      A.    I know he was talking to the passenger of

10  the vehicle at the time.

11     Q.    Okay.  So to search the vehicle, you have

12  to remove all occupants?

13     A.    Yes, sir.

14     Q.    What, if anything, did Detective Kent do

15  with the passenger Mr. Freeman?

16     A.    He removed him from the vehicle as well.

17     Q.    Okay.  And then you searched the vehicle?

18     A.    Yes, sir.

19     Q.    What, if anything, did you observe to be

20  found?

21     A.    I located the marijuana that the driver

22  had informed me was there, and Detective Kent

23  located a bag in the back floorboard of the vehicle

24  behind the passenger seat containing two other

Proceeding - August 18, 2020

59

1   baggies:  one had a grayish-brown substance, and the

2   other one had what appeared to be ecstasy in it.

3       Q.    And that location where the bag that

4   contained what you believed to be narcotics, was

5   that behind where Mr. Freeman was sitting?

6       A.    Yes, sir.

7       Q.    Okay.  So you've made this traffic stop,

8   based on several citations.  You search the vehicle.

9   What do you do, if anything, next?

10      A.    Then we placed them in custody,

11  transported them to 51 South Flicker where we took

12  statements.

13      Q.    Were you an active participant in taking a

14  statement?

15      A.    Yes, sir.

16      Q.    From who?

17      A.    Mr. Freeman.

18      Q.    All right.  What, if anything, did you do

19  before taking Mr. Freeman's statement?

20      A.    We Mirandized him.

21      Q.    Okay.  And is that normally done in a

22  written form?  How does that work?

23      A.    Yes.  We gave him a rights waiver form,

24  went through each line to make sure that he

Proceeding - August 18, 2020

60

1   understood.  He then initialed next to each line

2   stating that he understood what they were.  He then

3   waived his rights and agreed to give a statement.

4       Q.    Did anything Mr. Freeman say lead you to

5   believe that he did not understand his rights?

6       A.    No, sir.

7       Q.    And just briefly describe what Mr. Freeman

8   said in that statement.

9       A.    He just -- he advised that the narcotics

10  that we recovered in the baggy on the back

11  floorboard belonged to him.  We asked him what the

12  narcotics were.  He said some ecstasy and some

13  heroin.  He then advised that he had the heroin in

14  an attempt to sell it to make money.

15      Q.    Okay.  Is there anything else regarding

16  this traffic stop that -- that you think the Court

17  should be aware of?

18      A.    No, sir.

19            MR. ALLEN:  Pass the witness, Your Honor.

20            THE COURT:  Cross?

21            MR. NKRUMAH:  May I, Your Honor?

22            THE COURT:  Yes, sir.

23                    CROSS-EXAMINATION

24  BY MR. NKRUMAH:

Proceeding - August 18, 2020

61

1     Q.    Good morning, Detective Redding.

2     A.    Good morning, sir.

3     Q.    My name is Kafahni Nkrumah, and I'm the

4  attorney for Mr. Martavius Freeman.  I'm going to

5  ask you some questions this morning surrounding

6  the -- your encounter with Mr. Freeman on February

7  2nd, understand?

8     A.    Yes, sir.

9     Q.    If I ask you a question that you don't

10 understand, please let me know that you didn't

11 understand the question.  Okay?

12    A.    Yes, sir.

13    Q.    Can I say that it's safe for me to assume

14 that if you don't let me know you don't understand

15 the question, that you understood the question,

16 right?

17    A.    Yes, sir.

18    Q.    Okay.  You stated that you're a member of

19 the organized crime unit, correct?

20    A.    Yes, sir.

21    Q.    And on the afternoon of February 2, 2019,

22 you would -- you were on patrol in the vicinity of

23 Johnson Avenue and Vandalia Street, correct?

24    A.    I believe that's not the

Proceeding - August 18, 2020

62

1   (indiscernible) --

2            (WHEREUPON, THE STENOGRAPHER REQUESTS

3   CLARIFICATION.)

4            (WHEREUPON, A DISCUSSION WAS HAD WITH THE

5   STENOGRAPHER OFF THE RECORD, AND THEN THE

6   PROCEEDINGS CONTINUED AS FOLLOWS:)

7            THE COURT:  You just got to make sure you

8   speak up.  Between the mask and all that and the

9   fact that you're turned that way, it's just hard for

10  her to hear.

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  So you just got to make sure

13  you speak up.  Okay?

14           THE WITNESS:  Yes.

15  BY MR. NKRUMAH:

16      Q.   And you testified that night -- that your

17  partner was Detective Kent?

18      A.   Yes, sir.

19      Q.   And you were the driver of the vehicle,

20  the patrol vehicle that night, right?

21      A.   Yes, sir.

22      Q.   You weren't running any radar that night,

23  were you?

24      A.   No, sir.

Proceeding - August 18, 2020

63

1    Q.    You didn't have -- you weren't using any

2  standalone radar in order to gauge someone's speed?

3    A.    No, sir, we weren't.

4    Q.    Okay.

5         (WHEREUPON, A DISCUSSION WAS HAD WITH THE

6  STENOGRAPHER OFF THE RECORD, AND THEN THE

7  PROCEEDINGS CONTINUED AS FOLLOWS:)

8         THE COURT:  Tell you what, Officer.  Let's

9  try this:  If you'll come to the witness stand, and

10 we'll see if that mic is going to work any better

11 because that mic has been -- and then once you're

12 seated there, you can pull -- you can pull that mic

13 closer to you.  It's not affixed, I don't think.

14 Oh, maybe it is.

15         THE CLERK:  It is.

16         THE COURT:  Okay.  All right.  Sorry.  I

17 forget.

18         Let's try this again.

19         MR. NKRUMAH:  I can inquire, Your Honor?

20         THE COURT:  Yes, sir.

21         MR. NKRUMAH:  Thank you.

22 BY MR. NKRUMAH:

23    Q.    Detective, when you were on Vandalia

24 Street -- when you observed the Altima that my

64

1  client was in, you were sitting on Vandalia Street,

2  correct?

3      A.    Yes, sir.

4      Q.    And you observed Mr. -- you observed the

5  Altima that my client was in drive past you,

6  correct?

7      A.    Yes, sir.

8      Q.    Now, this was late in the afternoon,

9  wasn't it, Detective?

10      A.    Yes, sir.

11      Q.    On February -- in February, correct?

12      A.    Yes, sir.

13      Q.    And it was starting to get dark, wasn't

14  it?

15      A.    There was more than enough light, sir.

16      Q.    But it was starting to get dark, right?

17  Dusk?

18      A.    I don't remember what time the sun set.

19      Q.    Okay.  And after the Altima passed you,

20  you took off after the Altima, correct?

21      A.    Yes, sir.

22      Q.    So you went from a standing position to a

23  moving position to catch up to the Altima, correct?

24      A.    Yes, sir.

**Proceeding - August 18, 2020**

65

1    Q.    So you had to accelerate to catch up to
2  the Altima, right?

3    A.    Yes, I did.

4    Q.    Okay.  So you accelerated to catch up to
5  the Altima, and once you caught up to the Altima,
6  you stated that you paced the vehicle, correct?

7    A.    Yes, sir.

8    Q.    Okay.  I believe your testimony was, in
9  catching up to the vehicle, it took you -- in order
10 to catch up to the vehicle, you had to go about 45
11 miles an hour, correct?

12   A.    No, sir.  We went above 45 miles an hour
13 to catch up to them.  And then once we got behind,
14 during the course of pacing them, we were going
15 approximately 45 miles an hour.

16   Q.    How far away from the vehicle were you
17 when you -- when you were pacing the vehicle,
18 Detective?

19   A.    We were close enough to get a tag, so I
20 can't say exactly, but --

21   Q.    A half a car length?

22   A.    Don't recall the exact distance.

23   Q.    Okay.  And in pacing this vehicle -- let
24 me back up.  Let me back up.

Proceeding - August 18, 2020

66

1           Vandalia Street.  All right.  How far is
2   that from Gracewood?  How many blocks?
3       A.    I believe it is the -- Gracewood, I
4   believe -- not for sure, but I believe it's the
5   third turn.
6       Q.    About two blocks, you would say?
7       A.    If it was the third, it would be around
8   three blocks, sir.
9       Q.    Around three blocks.
10          So it's your testimony that you followed
11  this vehicle.
12          When did you turn your lights on,
13  Detective?  Were you still on Johnson Street?
14      A.    No, sir.  We were on Crystal.
15      Q.    So you were on Crystal Street when you
16  turned on your lights.
17          So you stated that you -- one second.
18  Strike that.
19          At some point, Johnson Street turns into
20  Hale Avenue, correct?
21      A.    I believe so.
22      Q.    And at -- and at that point, that point is
23  Tillman Street, correct?
24      A.    I have no idea what the actual point that

67

1    it changes.

2        Q.    So when you're on Hale Avenue, Hale Avenue

3    is Hale Avenue no matter where you're at because you

4    don't know where the change is, Detective?

5        A.    Well, I know Hale and Johnson -- they turn

6    into -- like, Johnson turns into Hale, Hale turns

7    into Johnson.  I don't know when the exact cutoff

8    is.

9        Q.    So you could've been on Hale street when

10   you saw -- the Altima could've been on Hale Street

11   and not Johnson, correct?

12       A.    I -- it is the same street.  It just has a

13   different name depending on which block you're on.

14       Q.    But that's important, the name of the

15   street, right?

16       A.    Not (indiscernible) --

17           (WHEREUPON, THE STENOGRAPHER REQUESTS

18   CLARIFICATION.)

19           THE COURT:  Do you need them to repeat the

20   question and the answer?

21           (WHEREUPON, THE STENOGRAPHER RESPONDS.)

22           THE COURT:  If you could repeat your

23   answer again, sir.

24           THE WITNESS:  To which question, ma'am?

Proceeding - August 18, 2020

68

1          THE COURT:  The last one.  The answer you
2   were just giving, if you could start from the
3   beginning because the --
4      A.    I'm not sure what you mean by that
5   question.
6   BY MR. NKRUMAH:
7      Q.    Isn't it important to -- isn't it
8   important to know the difference, where the streets
9   start and end, Detective?
10      A.    I believe that as long as we're -- if
11   someone's committing an offense that we know is an
12   offense, it doesn't matter necessarily which street
13   it is at that point.  We then have the right to get
14   behind them.
15      Q.    So it doesn't matter what street someone
16   is on when they commit an offense?
17      A.    I --
18      Q.    That's your testimony, Detective?
19      A.    It is the same street; it's just the name
20   changes depend --
21      Q.    That wasn't my question, Detective.  My
22   question to you was, Isn't it important to know the
23   street?  Correct?
24      A.    Yes, sir.

Proceeding - August 18, 2020

**69**

1    Q.    Because cross streets -- they're different

2  along that route, right?

3    A.    I believe Vandalia only crosses that

4  street at one point.

5    Q.    It only crosses -- it only crosses on

6  Johnson Street, correct?

7    A.    I believe so.

8    Q.    There's no Vandalia on Hale -- Hale

9  Avenue, is there?

10    A.    Don't believe there is.

11    Q.    There isn't, right?

12           So it is important that you know where

13  you're at, correct?

14    A.    Yes, sir.

15    Q.    And the direction that you're going in,

16  that's important, too, isn't it?

17    A.    Yes, sir.

18    Q.    Because when people like me are

19  investigating, we're going off of your notes,

20  correct?

21    A.    That's correct.

22    Q.    And if your notes are incorrect, that just

23  takes us all the way around to nowhere; am I right,

24  Detective?

Proceeding - August 18, 2020

70

1      A.    I wouldn't say it takes us nowhere, sir.

2      Q.    It does take us to nowhere because we

3   don't know where the incident happened, right, if

4   your notes are incorrect, right?

5      A.    I would say that critical thinking can

6   tell us where it happened at.

7      Q.    Critical thinking?

8      A.    Yes, sir.

9      Q.    So we should rely on critical thinking and

10  not your reports; that's what you're telling us

11  today?

12     A.    No, sir.  I believe that because Johnson

13  and Hale Street are the same street and they only

14  intersect with one, then that kind of narrows down

15  to one location.

16     Q.    And so we have to figure -- so we have to

17  figure that out when you incorrectly put it in a

18  report, correct?  Correct, Detective?

19          MR. ALLEN:  Objection, Your Honor.  We

20  haven't established that he put anything in any

21  report.  I mean, I understand the general

22  questioning of it's important to have accurate

23  reports.  But we -- he's hypothetically asking him

24  about something that we haven't seen that -- an

Proceeding - August 18, 2020

71

1  actual report that this witness has been the author

2  of.

3          THE COURT:  Mr. Nkrumah?

4          MR. NKRUMAH:  If he can answer, Your

5  Honor.

6      A.   Can you repeat the question, please?

7          MR. NKRUMAH:  Can you repeat the question

8  for (indiscernible) --

9          (WHEREUPON, THE STENOGRAPHER REQUESTS

10  CLARIFICATION.)

11          MR. NKRUMAH:  Could you repeat the

12  question for him, Ms. Court Officer?  Could you

13  repeat the question?

14          (WHEREUPON, THE STENOGRAPHER READS BACK

15  THE REQUESTED PORTION.)

16      A.   Could you just, I guess, explain a little

17  more what you mean by that?

18  BY MR. NKRUMAH:

19      Q.   You testified that it's only important

20  that he committed an offense, right?  That's what

21  you just testified to about two, three minutes ago,

22  correct?

23          MR. ALLEN:  Your Honor, I'd object to

24  that.  He asked that question.  He narrowed down the

Proceeding - August 18, 2020

72

1   area.  And then the question -- follow-up question

2   was, It is important to get this right, which was

3   the follow-up to, It's only important of -- that an

4   offense happens.

5           So I think that's misleading to the Court.

6   I think that's misleading to the witness as well

7   because he did generally ask that question, but then

8   he followed that up.  And this witness has clarified

9   that it is important to not only get the location

10  right.  So I don't think that's a fair question.

11          THE COURT:  We need to move to the next

12  question.

13  BY MR. NKRUMAH:

14      Q.   So it's your testimony today that this

15  vehicle was traveling westbound on Johnson Street,

16  correct?

17      A.   Yes, sir.

18      Q.   And not eastbound on Hale Street, right?

19      A.   Yes, sir.

20      Q.   Okay.  And you pulled behind the vehicle,

21  correct?

22      A.   Yes, sir.

23      Q.   Now, there are stop signs from Vandalia to

24  Grace, correct?

Proceeding - August 18, 2020

73

```
 1        A.    I do not believe there is.
 2             MR. NKRUMAH:  Have a moment, Your Honor?
 3             THE COURT:  You may.
 4   BY MR. NKRUMAH:
 5        Q.    So it's your testimony, Detective, that
 6   there are no stop signs on Johnson Street between
 7   Vandalia and Gracewood?
 8        A.    I do not remember any stop signs.
 9        Q.    Don't remember any stop signs.
10             And you testified that you -- you didn't
11   turn your lights on until you pulled them over on
12   Crystal Avenue, correct?
13        A.    Yes, sir.
14        Q.    Now, you were driving, so you didn't radio
15   dispatch, did you?
16        A.    I do not remember who radioed at the time.
17        Q.    But you didn't radio, right?
18        A.    I do not recall.
19        Q.    You don't recall if you used the radio?
20        A.    Again, I don't recall who radioed in.
21        Q.    Do you know -- do you recall if your
22   partner used the radio at that time?
23             MR. ALLEN:  Asked and answered, Your
24   Honor.  He said --
```

Alpha Reporting Corporation

Proceeding - August 18, 2020

74

```
 1          THE COURT:  Asked and answered.  He
 2   doesn't recall who did.
 3   BY MR. NKRUMAH:
 4     Q.    During all of this, Detective, there's no
 5   vehicle cam, is it?
 6           Vehicle dashcam.
 7           Is there?
 8     A.    No, sir.
 9     Q.    And no body-cam recording of this
10   incident, correct?
11     A.    There is not.
12     Q.    So we don't have any -- no recordings of
13   anything that you just testified to, correct?
14     A.    That is correct.
15     Q.    Okay.  Now, you stated after you pulled
16   the vehicle over, you approached the vehicle,
17   correct?
18     A.    Yes, sir.
19     Q.    On the driver side of the vehicle?
20     A.    Yes, sir.
21     Q.    And you encountered Mr. Mason, correct?
22     A.    Yes, sir.
23     Q.    And when you encountered Mr. Mason, you
24   began asking Mr. Mason questions, correct?
```

Proceeding - August 18, 2020

75

1    A.    I asked him if there was anything in the

2 vehicle I need to know about.

3    Q.    You approached the vehicle, and you

4 encountered Mr. Mason.  You asked him if there was

5 anything in the vehicle that -- that you needed to

6 know about?

7    A.    Yes, sir.

8    Q.    And he responded how, Detective?

9    A.    Stated there was only a little bit of

10 marijuana.

11    Q.    You also testified that after Mr. Mason

12 stated that there was a little bit of marijuana, you

13 asked him to exit the vehicle?

14    A.    After identifying him, yes.

15    Q.    After identifying him?

16    A.    Yes, sir.

17    Q.    So he asked -- he told you it was a little

18 marijuana; you went back to the car and identified

19 him?

20    A.    No, sir.  I used my PDA.

21    Q.    You used your PDA.

22         So you stood there at the -- at the

23 vehicle with Mr. Mason, and you took out your PDA,

24 and you verified who he was?

Proceeding - August 18, 2020

76

1      A.    Yes, sir.

2      Q.    And after verifying who he was, you took

3  him out of the vehicle, correct?

4      A.    Yes, sir.

5      Q.    And after taking him out of the vehicle,

6  you placed him in your patrol car, correct?

7      A.    Yes, sir.

8      Q.    Now, he was under arrest at this time,

9  wasn't he?

10     A.    Yes, sir.

11     Q.    Now, at this time, Mr. Freeman was still

12  in the vehicle, correct?

13     A.    Yes, he was.

14     Q.    And your partner was questioning

15  Mr. Freeman, correct?

16     A.    I was not over with my partner at the

17  time.  I don't know.

18     Q.    So you're not sure if your partner was

19  questioning Mr. Freeman?

20     A.    Again, if they were speaking, I don't know

21  what they were speaking about.  I was talking to the

22  individual that I was in contact with.

23     Q.    Okay.  And at some point, you saw your

24  partner take Mr. Freeman out of the vehicle,

Proceeding - August 18, 2020

77

1  correct?

2      A.     Yes, sir.

3      Q.     And place Mr. Freeman in your vehicle,

4  correct?

5      A.     Yes, sir.

6      Q.     And you two started searching the vehicle,

7  correct?

8      A.     Yes, sir.

9      Q.     It wasn't long after you begun searching

10  the vehicle that you found the contraband, correct?

11  That your partner found the contraband, correct?

12     A.     Yes, sir.

13     Q.     And after finding the contraband, you

14  placed Mr. Freeman and Mr. Mason under arrest?

15     A.     Yes, sir.

16     Q.     And you took -- and took them both down to

17  the station, correct?

18     A.     Yes.

19     Q.     Now, the search -- from the -- from the

20  time you stopped the vehicle to the time you did the

21  search, would it be fair to say, Detective, that

22  maybe two minutes, three minutes had passed?

23     A.     I don't know the exact time.  It wasn't a

24  long time.

Proceeding - August 18, 2020

78

```
 1      Q.    It wasn't a long time, though, right?

 2      A.    No, sir.

 3      Q.    It wasn't 10 minutes, right?  It wasn't --

 4  wasn't half an hour?

 5      A.    It could be 10 minutes.  I would say it

 6  wouldn't be a half an hour.

 7      Q.    Maybe 10 minutes.

 8            And in that 10 minutes, you had stopped

 9  the vehicle, correct?

10      A.    Yes, sir.

11      Q.    Questioned Mr. Freeman and Mr. Mason,

12  correct?

13      A.    Again, I cannot say what Mr. Freeman

14  (indiscernible) --

15            (WHEREUPON, THE STENOGRAPHER REQUESTS

16  CLARIFICATION.)

17            THE COURT:  You got to speak up, Officer,

18  or get closer to that microphone.

19            THE WITNESS:  Sorry.

20            THE COURT:  Or take the mask off, one of

21  them, but I can barely hear you, and I'm right next

22  to you.

23            So repeat your answer from just now.

24      A.    I cannot state what Mr. Freeman was talked
```

Proceeding - August 18, 2020

79

 1  to about.

 2  BY MR. NKRUMAH:

 3      Q.    But in less than 10 minutes, they were

 4  questioned.  They were questioned, placed in the

 5  vehicle, and the vehicle was searched, correct?

 6      A.    I would -- the full search of the vehicle

 7  probably took a little bit more than that, but

 8  around that time, yes, sir.

 9      Q.    Then after -- after retrieving the

10  contraband, as -- Mr. Mason was under arrest,

11  correct?

12      A.    Yes, sir.

13      Q.    And Mr. Freeman, right?

14      A.    At that point, Mr. Freeman was going to be

15  detained until we took a statement discovering who

16  the narcotics belonged to.

17      Q.    But -- so Mr. Freeman wasn't arrest?

18      A.    At that point, I believe he was just being

19  detained.  Like I said, I don't know what he had

20  told my partner or anything.  I had not had a

21  chance.

22      Q.    He took him back to the station, took

23  the -- took both individuals back to the station,

24  right?

Proceeding - August 18, 2020

80

1    A.    Yes, sir.

2    Q.    Read them their rights?

3    A.    Yes, sir.

4    Q.    And you interviewed Mr. Freeman, correct?

5    A.    Yes, sir.

6    Q.    And he admitted to the -- to the

7 substance -- owning the substance in the vehicle,

8 correct?

9    A.    Yes, sir.

10   Q.    Your interview with Mr. Freeman, that

11 didn't take long, either, did it, Detective?

12   A.    It took a little longer.  We usually,

13 after notifying them of their rights, take quick

14 verbal statements just talk to them and then take a

15 typed statement.  I was the one that actually typed

16 the statement, and I'm not the quickest of typers,

17 so I'm not sure exactly how long it took, but it is

18 not a quick process.

19   Q.    But the verbal statement that he gave is

20 basically the typed statement, correct?

21   A.    Yes, sir.

22   Q.    And that didn't take long, correct?

23   A.    Again, I don't --

24   Q.    You didn't have a long, drawn-out "it's

Proceeding - August 18, 2020

81

```
 1  not mine" with Mr. Freeman, right?
 2       A.    No, we did not.
 3       Q.    He -- he readily admitted that the -- that
 4  the contraband was his, right?
 5       A.    Yes, sir.
 6       Q.    And he did that during the oral statement,
 7  right?
 8       A.    Yes, sir.
 9       Q.    Not long after you had put him in the
10  interrogation room and gave him his rights, right?
11       A.    Yes, sir.
12            MR. NKRUMAH:  One second, Your Honor.
13            THE COURT:  Yes, sir.
14  BY MR. NKRUMAH:
15       Q.    Just a couple questions more, Detective.
16       A.    Yes, sir.
17       Q.    You stated that Mr. Mason had a warrant,
18  correct?
19       A.    Yes, sir.
20       Q.    And you found that out through your, I
21  guess, PDA, correct?
22       A.    Yes, sir.
23       Q.    Mr. Freeman didn't have a warrant, right?
24       A.    I did not run him, but I do not recall.
```

82

1    Q.    So to your knowledge, because you didn't

2  run Mr. Freeman, he didn't have a warrant, right?

3    A.    Yes, sir.

4        MR. NKRUMAH:  No further questions.

5        THE COURT:  Redirect?

6        MR. ALLEN:  Just briefly.

7              REDIRECT EXAMINATION

8  BY MR. ALLEN:

9    Q.    Detective Redding, you were asked if there

10 are any stop signs on Johnson regarding -- you know,

11 between the streets you were sitting on and the

12 street that it would turn.  I just want to ask you a

13 question about that.

14        Is that -- when you answered that, are you

15 referring specifically to Johnson?  Like, there's no

16 stop signs if you were traveling east or eastbound

17 down Johnson?

18        MR. NKRUMAH:  Objection, Your Honor;

19 leading.

20    A.    Yeah, I --

21        THE COURT:  Hang on a second.

22        What was your question again?

23        MR. ALLEN:  I asked -- I asked him if

24 there's -- when he answered the question, to clarify

Proceeding - August 18, 2020

83

1  his answer.  Was he -- when he answered that, did he

2  mean there was no stop signs on Johnson, as if you

3  were traveling east or westbound down that street?

4        THE COURT:  That's not leading.  Objection

5  overruled.  That's what I thought I heard.

6     A.   I'm not sure about the cross streets, if

7  there would be stop signs.  If that's what you're

8  asking about, the cross streets, I'm not sure if

9  they have stop signs, yield signs.  I'm not sure.

10 BY MR. ALLEN:

11     Q.   That -- that's -- that was what I was

12 going to follow up with.  You've answered it.

13        MR. ALLEN:  That's all the questions I

14 have, Your Honor.

15        THE COURT:  All right.  Thank you, sir.

16 You may step down.

17        THE WITNESS:  (Complying with request.)

18        THE COURT:  Any further proof from the

19 United States?

20        MR. ALLEN:  Nothing from the government.

21        THE COURT:  Mr. Nkrumah, any proof?

22        MR. NKRUMAH:  No, Your Honor.

23        THE COURT:  All right.  Then I have all

24 three exhibits.  I've got your motions.  I don't

84

1   think I particularly need a closing brief.  If y'all

2   would like to make closing argument, that's fine.

3             MR. ALLEN:  Yes, just briefly, Your Honor.

4             You've had two witnesses to come forward.

5   They're both experienced officers and detectives

6   with the Memphis Police Department that testified to

7   substantially the same factual basis.

8             You have a traffic stop where they're

9   sitting -- both of them positively identified

10  Mr. Freeman as the passenger in that vehicle.  Both

11  individuals said they were certain -- fairly

12  certain.  One said a hundred percent -- or excuse

13  me -- one said very certain, and the other one said

14  100 percent that both these individuals were not

15  wearing their seat belt.  That alone is a basis to

16  stop this vehicle.

17            They pulled out behind the vehicle.  The

18  officer driving testified that he got behind it and

19  believed it to be speeding, a individual that's been

20  a part of hundreds, if not thousands, of traffic

21  stops.

22            Then you have the other officer, Detective

23  Kent, who said that the tags on the vehicle did not

24  match the make and model.  You have a Nissan and the

85

1  tags for a Chevy.  That's another basis to stop this

2  vehicle.

3        Then there were several turns without

4  signals; although, they weren't charged.  That's

5  another basis to pull the vehicle over.

6        And then on top of the violation of the

7  registration, the speeding, the turns, they waited a

8  little bit longer.  Then they got behind the

9  vehicle, and then they stopped it.

10        So it's a very solid traffic stop on the

11  basis.  There's nothing that -- to hear from the

12  testimony today that undermines the credibility of

13  these officers.  They saw what they saw, and they

14  testified to it, and they testified to the same

15  thing.

16        Then you speak to the driver who not only

17  has an active warrant, but he ultimately admits that

18  there's marijuana in the vehicle.  That gives them

19  probable cause at that point to search the vehicle.

20  They bring the driver out; they bring Mr. Freeman

21  out.  They locate the drugs right behind where he's

22  sitting.

23        After that, they take Mr. Freeman down.

24  They advise him of his rights, and he waives those

86

1  rights.  He makes a knowing, voluntary waiver after

2  being read the advice of rights form, which is an

3  exhibit.  He provides a statement that that was his

4  heroin, and he planned to sell it.  So there's

5  nothing unusual about this traffic stop.  These

6  officers went by the policies in the book or the

7  best of their training.

8          Just because it says "eastbound on Hale"

9  when they were westbound on Johnson, that's a

10  typographical error.  He wasn't intending to mislead

11  the judicial commissioner.  That was his testimony.

12          And on top of all this, Your Honor,

13  attached to the filing -- and Detective Kent

14  corroborated this -- Mr. Freeman was on state

15  probation at the time.  He was subject to a search

16  provision.  That's attached to my filing.  It's

17  Attachment A.  He was on state probation where he

18  says, I agree to be subject of my person, and

19  vehicle or whatnot to be searched without additional

20  probable cause.

21          So there's nothing here that causes the

22  government any concern regarding the search.  These

23  officers are experienced, and they did their job,

24  and they didn't do anything wrong here.  So this

87

1  motion should be denied because they had multiple

2  bases to stop the vehicle, and then they had a

3  valid, legal purpose to search it.

4         And then the statement afterward is done

5  right.  They did the -- exactly what they should

6  have done.  They Mirandized him, made sure he

7  understood his rights, and then he gave an

8  incriminating statement.  He's just upset about what

9  he's facing right now.

10         This motion should be denied, Your Honor.

11         THE COURT:  All right.  Mr. Nkrumah?

12         MR. NKRUMAH:  May I, Your Honor?

13         THE COURT:  You may, sir.

14         MR. NKRUMAH:  Your Honor, Mr. Freeman asks

15  that this motion be granted in its entirety and the

16  contraband that was found during the search and his

17  statements suppressed.

18         Your Honor, this isn't as clean-cut as the

19  prosecution would like to make -- make it -- sound

20  it -- sound it out to be.

21         It's troubling, Your Honor, when

22  experienced detectives -- we're not talking police

23  officers; we're talking detectives -- can -- it's

24  troubling when they don't know where they're at,

88

1  where they can -- where they cannot only not know

2  where they're at but also inform the judicial

3  commissioner incorrectly about the events that

4  occurred at that time.  Your Honor, it's important

5  for the police officer to know where they are.

6          As Detective Redding testified, there is

7  no -- it's important because the streets -- cross

8  streets, Your Honor, they're not the same on Johnson

9  and Hale.  Even if Johnson and Hale do -- does

10  change after a certain point, the cross sections,

11  they're not the same.  The intersections, they're

12  not the same.  And Johnson Street is a different

13  street than Hale.  It's important that these

14  officers get it right, and they didn't.  They

15  testified today that it was Johnson.  Detective Kent

16  testified to the judicial commissioner of Shelby

17  County that it was Hale.

18          As far as the speeding is concerned, Your

19  Honor, it's literally impossible to pace someone on

20  a city street.  Based on the fact, Your Honor, that

21  you need distance, based on the fact, Your Honor,

22  that once you've gotten -- once you've gotten to a

23  speed where you believe that the vehicle is -- is

24  traveling at, comparable to your vehicle -- which

**89**

1  you have to check your speedometer in order to do --

2  it's literally impossible because the stop signs and

3  just the busyness of a street to pace a vehicle on a

4  street.  It would have to be no other vehicles on

5  the street.  There would have to be -- there would

6  have to be a distance of more than half a car

7  length, Your Honor, in order to properly pace a

8  vehicle.

9          Detective Redding testified that he was

10  maybe a half a car length because they were able to

11  read the license plate on the vehicle.  Your Honor,

12  pacing also means spacing, and there was not enough

13  spacing for them to -- for them to get an adequate

14  read -- approximate read on the speed that the

15  vehicle was traveling.

16          They also testified, Your Honor, that the

17  license plate was no good.

18          Detective Kent testified that normal

19  practice was to go through dispatch, was to radio

20  dispatch about where they were, about what the stop

21  is.  I submit, Your Honor, normal practice is to go

22  through dispatch also to run registrations.  That

23  wasn't done in this case.  We don't know when they

24  received the information that the license plate was

90

1   no good.  A ticket doesn't corroborate the fact that
2   they got that information before they pulled the
3   vehicle over or after they pulled the vehicle.
4         Your Honor, they also testified about a
5   turn signal.  What -- no cam recording, no dashcam
6   recording, no body-cam recording.  We basically have
7   to take these officers at their word, officers that
8   we know -- know that it's not important to know
9   where they are, believe that it's not important to
10  know where the offense occurred, that the only
11  importance is the offense occurred.
12        Your Honor, I don't say that these
13  officers are deliberately trying to mislead the
14  Court.  My proposition, Your Honor, is that the --
15  the fact that nothing that the officers testified to
16  was corroborated and the fact that these officers'
17  testimony greatly differs from the actual events
18  that occurred.  Going eastbound and westbound --
19  even if you don't know the streets, if you're facing
20  southbound, like Detective Kent testified to, you
21  know which way is east and west.
22        These officers, with five-plus years of
23  experience -- detectives, not just regular police
24  officers, detectives -- they don't know east or

Proceeding - August 18, 2020

**91**

1  west, but they want this court to believe they don't

2  know east and west.

3        Your Honor, based on -- based on the

4  troubling discrepancies in the testimonies, based on

5  the contradictions in the -- in their reports as

6  opposed to what they testified to, Your Honor, we

7  can't say that this stop was supported by probable

8  cause or reasonable suspicion.

9        What's telling, Your Honor, is Detective

10  Redding testified that as soon as he approached

11  Mr. Mason, the first thing he asked him -- the first

12  thing he asked him, What do you have in the car that

13  I should be aware of?  He doesn't inform him why he

14  stopped them.  He doesn't tell them, You were

15  speeding; your license plate is this; your license

16  plate is no good; you didn't turn.  None of that.

17  The very first thing he says, What do you have in

18  the car that I should know about?

19        This stop wasn't because of a traffic

20  violation.  This stop was a fishing expedition, a

21  "hopefully maybe something will be found" stop.

22        What's telling is the officers' words.

23  Didn't ask for -- didn't ask him why he was riding

24  with a expired license tag, didn't ask him why he

92

1   was speeding, didn't ask him why he didn't turn --

2   didn't turn on his turn signals when he turned, none

3   of that.  They questioned them about what was in the

4   vehicle, where they were going, what they were

5   doing, but nothing about why they stopped.  That's

6   telling.

7         Your Honor, they also testified that after

8   the stop, after the search, that they took

9   Mr. Freeman and Mr. Mason down.  Now, they knew that

10  it was Mr. Mason's vehicle.  They knew that

11  Mr. Mason had already admitted to possession of the

12  marijuana, and they find the drugs.  And according

13  to Detective Kent, they're both arrested.  According

14  to Detective Redding, only one is arrested.  The

15  other one is sent for questioning.  So we don't even

16  know, based on the testimony of the detectives, if

17  Mr. Freeman is under arrest or not.

18        They take him down to the precinct, and he

19  gives a statement, after being read his Miranda

20  rights.

21        Your Honor, I submit that the attenuation

22  that's needed in order to -- in order to -- in order

23  for this court not to suppress the contraband or the

24  statements is not here.  It's not found.  There was

93

1    no time.  Everything happened one right after the

2    other.  It was no time for recollection; there was

3    no time for reflection by Mr. Freeman, nothing.

4    Everything happened one, two, three:  the stop,

5    taking them out the vehicle, putting them in the

6    back of the vehicle, the search of the vehicle.

7    That all happened within a matter of minutes, within

8    a matter of minutes:  taking them down to the

9    precinct, reading them their rights.  And in -- in

10   interrogating them -- in which the interrogation was

11   not long, Your Honor, because they both testified

12   that Mr. Freeman just gave it up, that he didn't go

13   back and forth with them.  He didn't try to lie to

14   them; he just gave it up.

15           There was just not enough time that

16   passed, Your Honor, in order -- in order to make

17   this stop, which I submit was illegal, to make

18   the -- make the contraband that was found after the

19   stop and the statement that was given -- to make

20   them inadmissible.  And I would ask that this court

21   suppress the contraband and the statements that was

22   given by Mr. Freeman and grant his motion in its

23   entirety.

24           Thank you, Your Honor.

Proceeding - August 18, 2020

94

1              THE COURT:  Thank you, sir.

2              Counselors, thank you for your

3    presentations and argument.  The Court will receive

4    a copy of the transcript of the hearing, both on the

5    4th and today, as soon as possible, and we'll get a

6    report and recommendation filed to work with.

7              Anything else from the parties?

8              MR. ALLEN:  No, Your Honor.  My witness

9    has been under subpoena.  Can I let them go?

10             THE COURT:  They may -- they're released.

11             MR. ALLEN:  Thank you, Judge.

12             THE COURT:  Thank you very much.

13             MR. NKRUMAH:  Thank you, Your Honor.

14             THE COURT:  All right.  Everybody have a

15   good day.

16

17             (WHEREUPON, THE PROCEEDINGS CONCLUDED

18               AT APPROXIMATELY 12:02 P.M.)

19

20

21

22

23

24

Alpha Reporting Corporation

```
1                    C E R T I F I C A T E

2    STATE OF TENNESSEE:

3    COUNTY OF SHELBY:

4
             I, LASHAWN MARSHALL, RPR, LCR #367, Licensed
5    Court Reporter, in and for the State of Tennessee,
     do hereby certify that the above proceeding was
6    reported by me, and the transcript is a true and
     accurate record to the best of my knowledge, skills,
7    and ability.

8
             I further certify that I am not related to
9    nor an employee of counsel or any of the parties to
     the action, nor am I in any way financially
10   interested in the outcome of this case.

11
             I further certify that I am duly licensed by
12   the Tennessee Board of Court Reporting as a Licensed
     Court Reporter as evidenced by the LCR number and
13   expiration date following my name below.

14
             I further certify that this transcript is
15   the work product of this court reporting agency and
     any unauthorized reproduction and/or transfer of it
16   will be in violation of Tennessee Code Annotated
     39-14-104, Theft of Services.

17

18

19

20

21
     _____
22   Lashawn Marshall, RPR, LCR #367
     Expiration Date 06-30-2022
23   ALPHA REPORTING CORPORATION
     236 Adams Avenue
24   Memphis, Tennessee  38103
```

Alpha Reporting Corporation

**Proceeding - August 18, 2020**

**1**

**1** 17:9 18:3,12 19:10, 15,17 39:7

**10** 78:3,5,7,8 79:3

**100** 84:14

**10:26** 4:2

**12:02** 94:18

**16:50** 20:10 21:11

**2**

**2** 15:10 19:4,23 39:2,4 51:19 61:21

**2/2/2019** 20:7,10

**2019** 7:24 15:10 16:12 19:4,23 43:18 51:3,19 61:21

**25** 53:22

**25-mile-per-hour** 20:13 21:3

**2nd** 7:24 9:9 16:12 19:20 21:11 61:7

**3**

**3** 42:17,19

**4**

**45** 20:12 21:2 22:4,18 53:22 65:10,12,15

**4:50** 21:17

**4th** 7:21 14:15 27:9 94:5

**5**

**51** 32:12 59:11

**5:00** 21:17

**A**

**a.m.** 4:2

**ABOVE-MENTIONED** 17:19 19:16 39:3 42:18

**Absolutely** 17:18

**academy** 12:9,13,16, 21 13:9,10,12

**accelerate** 65:1

**accelerated** 65:4

**accessing** 10:23

**accurate** 13:17 14:5, 11 16:23 41:8 70:22

**accurately** 13:21 19:2

**acknowledge** 42:6

**activate** 56:13

**active** 57:16 59:13 85:17

**actual** 66:24 71:1 90:17

**additional** 13:3 86:19

**adequate** 89:13

**adjourned** 4:17

**administered** 42:1

**admission** 18:12

**admit** 18:5

**admits** 85:17

**admitted** 19:10,11 32:3 80:6 81:3 92:11

**advice** 42:1,11,16 86:2

**advise** 85:24

**advised** 5:1 44:20 57:7 60:9,13

**affidavit** 15:19,24 16:20 17:1,8,22 19:1,3, 7,15,21 20:1,2,4,5,9,14 21:3,5 39:7,10,11 40:1, 4,11,22 41:5

**affidavits** 14:5,8,12

**affixed** 63:13

**afternoon** 61:21 64:8

**afterward** 87:4

**agree** 11:5 21:21 34:8 35:10 86:18

**agreed** 60:3

**ahead** 10:7 18:22

**allegedly** 33:16

**Allen** 4:16,17,18,21 5:22 6:14 17:11,16 19:13 36:10,16 37:13, 15,21 38:20 39:9 40:9 42:10,21 44:6,7,8 45:16 46:22 49:5,19 50:19 52:12,15,16 60:19 70:19 71:23 73:23 82:6,8,23 83:10, 13,20 84:3 94:8,11

**Allen's** 6:4

**Altima** 10:2 14:17 20:2,11 23:1 47:11 54:19 63:24 64:5,19, 20,23 65:2,5 67:10

**apologies** 18:7 19:22

**appearance** 7:3

**appeared** 15:11,15 16:16 53:18 54:12 59:2

**approach** 17:17 25:4 36:11

**approached** 27:2,5 74:16 75:3 91:10

**approximate** 21:6 89:14

**approximately** 20:12 22:5,6 34:14,15 41:4 51:2 65:15 94:18

**area** 72:1

**argument** 84:2 94:3

**arrest** 15:23 76:8 77:14 79:10,17 92:17

**arrested** 15:16 29:8 32:19 44:21 92:13,14

**arresting** 29:11 44:24

**ascertain** 20:22

**asks** 87:14

**assume** 8:9 61:13

**attached** 86:13,16

**Attachment** 86:17

**attempt** 60:14

**attempted** 53:20 55:11,17

**attention** 41:14 51:9, 20

**attenuation** 92:21

**attesting** 17:2

**attorney** 5:14 39:13 61:4

**attorneys** 14:12

**August** 7:21

**AUSA** 4:16 46:21

**author** 71:1

**Avenue** 61:23 66:20 67:2,3 69:9 73:12

**aware** 56:3 60:17 91:13

**B**

**back** 6:21 13:8 14:15 18:15 19:20 25:15 33:15 35:6,22 44:17 52:17 53:24 56:9 58:23 60:10 65:24 71:14 75:18 79:22,23 93:6,13

**bag** 58:23 59:3

**baggies** 59:1

**baggy** 60:10

**barely** 78:21

**based** 6:3 30:6 41:1 55:2 57:12,20 59:8 88:20,21 91:3,4 92:16

**bases** 87:2

**basically** 16:19 80:20 90:6

**Proceeding - August 18, 2020**

**basis** 43:23 44:2 84:7, 15 85:1,5,11

**began** 27:10 31:3 74:24

**beginning** 34:19,23 68:3

**begun** 77:9

**believed** 47:2 59:4 84:19

**belonged** 32:1,4 56:18 60:11 79:16

**belt** 30:5,8 37:8 38:4 45:14 54:8,11,14,22 84:15

**belts** 25:20 26:7,10 45:11 53:17

**bit** 8:21,22 54:3 57:8,10 75:9,12 79:7 85:8

**block** 67:13

**blocks** 66:2,6,8,9

**blue** 56:13,17,19

**body** 23:10,14,19,20 26:9 42:23

**body-cam** 24:13,15 26:10,11 74:9 90:6

**book** 86:6

**bottom** 18:18 19:6

**break** 54:2

**briefly** 45:20 60:7 82:6 84:3

**bring** 85:20

**broadcast** 43:22 44:23

**broadcasting** 44:11

**brown** 52:9

**busyness** 89:3

**C**

**C-H-R-I-S** 7:7

**call** 10:6,7 49:20

**cam** 23:10,14,19,20

26:9,12 74:5 90:5

**camera** 42:23

**canceled** 38:5

**car** 31:7 47:12 48:8,9, 10,11 54:21 57:19 58:1 65:21 75:18 76:6 89:6, 10 91:12,18

**Carlos** 24:21 36:19 38:22 57:3

**cars** 24:5,8

**case** 38:15 42:12 89:23

**catch** 64:23 65:1,4,10, 13

**catching** 65:9

**caught** 55:16 65:5

**chance** 49:6 79:21

**change** 67:4 88:10

**changed** 32:7,12 41:24

**channel** 5:4 10:3

**charge** 37:2 38:10,16

**charged** 37:5,24 85:4

**charges** 38:8,18

**charging** 37:17

**check** 10:13 57:23 89:1

**Chevy** 85:1

**chose** 9:9 38:16

**Chris** 6:22 7:7,13

**citation** 22:12 36:18, 21 37:1 38:21 44:20

**citations** 59:8

**city** 47:5,22 50:22 88:20

**claimed** 29:5 32:15

**clarification** 6:17 9:15 16:4,6 24:7 28:10 32:10 34:22 62:3 67:18 71:10 78:16

**clarified** 72:8

**clarify** 82:24

**clean-cut** 87:18

**CLERK** 10:6 19:18 39:5 42:20 63:15

**client** 7:23 33:16 64:1, 5

**clock** 15:6

**close** 47:14 65:19

**closer** 8:20,23 50:9 63:13 78:18

**closing** 84:1,2

**Collective** 42:17

**college** 11:22

**comfortable** 50:7

**commissioner** 15:11 16:12 19:4 40:5,13,20 41:8 86:11 88:3,16

**commit** 68:16

**committed** 30:4,9 77:20

**committing** 68:11

**common** 38:7 43:16, 18 46:1,4,10

**communications** 43:6 44:12

**comparable** 88:24

**complaint** 15:19 17:8 19:1,3,15 39:7,10 40:1, 11,23

**complete** 13:23 14:4, 10 16:20

**completed** 15:18

**completely** 13:15,21

**comply** 43:9

**complying** 49:23 83:17

**compound** 40:7

**concern** 86:22

**concerned** 88:18

**CONCLUDED** 94:17

**conclusion** 44:15,18

**conduct** 43:17

**conducted** 31:9 41:23

**confessed** 36:4

**confidential** 5:9

**console** 29:3

**contact** 4:24 8:13 26:2,5 43:19 46:5,7,18 56:23 76:22

**contacted** 4:18,23

**contained** 59:4

**continue** 4:4 6:6,12 7:10 16:9

**CONTINUED** 7:16 9:19 10:10 35:3 62:6 63:7

**contraband** 31:18,19, 20,21,24 32:4,6,15,18 33:8 36:5 77:10,11,13 79:10 81:4 87:16 92:23 93:18,21

**contradictions** 91:5

**conversation** 4:16 16:1,7 27:13 39:12

**copy** 17:24 94:4

**correct** 4:12,21 9:11, 24 10:3 11:17 12:17 13:6 14:18 15:3,9,16, 20,24 16:13,21,23 20:14,20 21:9,22 23:24 24:4 25:17,21 26:7,8, 17 27:3,11,14,17,21 28:19,22 29:1,3,6,9 30:1,16,22 31:10,18,22 32:1,19,22 33:1,9,17 36:5 41:5 43:4,23 46:2, 12,22 47:1,5,8,15,19 48:4,18,21 58:5 61:19, 23 64:2,6,11,20,23 65:6,11 66:20,23 67:11 68:23 69:6,13,20,21 70:18 71:22 72:16,21, 24 73:12 74:10,13,14, 17,21,24 76:3,6,12,15 77:1,4,7,10,11,17 78:9, 12 79:5,11 80:4,8,20, 22 81:18,21

**Proceeding - August 18, 2020**

**correctly** 13:13

**corroborate** 22:17 90:1

**corroborated** 86:14 90:16

**could've** 67:9,10

**Counselors** 94:2

**county** 5:14 15:12,23 88:17

**couple** 36:17 81:15

**courses** 12:20,23

**court** 4:3,13 5:8,12,13, 19 6:1,5,11,14,20,24 7:9,11 8:17 9:2,16,21 10:7,12 15:12 16:5,9 17:6,14,18 18:4,8,11, 14,21 19:12,14,18 25:5 35:4 36:9,12 37:14 38:2,16,23 39:1,5,6 40:8 42:13,15,20 44:2, 5,9 45:18,21 49:3,9,15, 20 50:2,5,14 52:14 60:16,20,22 62:7,12 63:8,16,20 67:19,22 68:1 71:3,12 72:5,11 73:3 74:1 78:17,20 81:13 82:5,21 83:4,15, 18,21,23 87:11,13 90:14 91:1 92:23 93:20 94:1,3,10,12,14

**courtroom** 6:23 50:1 52:3

**credibility** 85:12

**crime** 23:13 51:4,21 61:19

**crimes** 30:9

**criminal** 15:12

**critical** 70:5,7,9

**cross** 60:20 69:1 83:6, 8 88:7,10

**cross-examination** 6:10 7:16 60:23

**crosses** 69:3,5

**Crystal** 56:15,16 66:14,15 73:12

**current** 11:23 50:20

**custody** 45:5 59:10

**cutoff** 67:7

---

**D**

**dark** 21:17,22 64:13,16

**dashcam** 23:8 24:10, 12 26:12,14 74:6 90:5

**dashcams** 23:23 24:3 42:24

**database** 10:23

**date** 51:20

**day** 15:2,8 16:15 20:17, 23 21:11 94:15

**days** 4:17

**deal** 5:8

**decided** 29:24

**defense** 5:13 14:12 39:13

**definition** 34:9

**deliberately** 90:13

**denied** 31:24 33:8 87:1,10

**department** 4:19 12:20 23:18,22 24:3 43:4,10 51:5,13,22 84:6

**department-issued** 10:17

**depend** 68:20

**depending** 67:13

**depends** 34:9

**describe** 52:8 60:7

**description** 44:13 46:12

**detain** 58:1

**detained** 26:16,20 30:15 31:6,7 57:19 79:15,19

**detaining** 30:18

**detective** 6:10,18,22 7:1,13,18 8:12,18 9:9, 24 11:2,6,8,11 12:6 14:15 15:10 17:12,23 18:1,10 19:1,20,23 20:7 22:10,15,20 24:20 25:9,16 35:10 36:17 42:22 43:3 45:19,24 46:19 47:4,21 48:7,12 49:1,3,11,21,24 50:3, 15 51:7 53:4 58:14,22 61:1 62:17 63:23 64:9 65:18 66:13 67:4 68:9, 18,21 69:24 70:18 73:5 74:4 75:8 77:21 80:11 81:15 82:9 84:22 86:13 88:6,15 89:9,18 90:20 91:9 92:13,14

**detectives** 20:10 34:2 84:5 87:22,23 90:23,24 92:16

**determine** 15:7

**difference** 68:8

**differs** 90:17

**difficult** 47:4

**diploma** 11:19 12:4

**direct** 22:20 40:24 41:13 43:1 45:11 50:18 51:9,20

**direction** 20:2 39:24 40:3,10 69:15

**discovered** 57:21

**discovering** 79:15

**discrepancies** 91:4

**DISCUSSION** 9:18 10:9 35:1 62:4 63:5

**discussions** 58:4

**dispatch** 8:13 9:5 10:14 23:4 26:3,5 42:24 43:7,18 46:5,7, 18 73:15 89:19,20,22

**distance** 47:8,13,16, 17 48:1,2,3,5,7,24 49:7 65:22 88:21 89:6

**disturbs** 6:8

**document** 17:19 19:16 25:6,9,12 36:13 37:20 39:3 41:14,19

**DOCUMENTS** 42:18

**drawn-out** 80:24

**drive** 54:16,21 64:5

**driven** 56:5

**driver** 22:11,21 27:7 29:20 31:15 36:19 38:16 45:13 53:16 54:10 56:23,24 58:21 62:19 74:19 85:16,20

**driving** 38:4 52:22 55:9 73:14 84:18

**drugs** 85:21 92:12

**duly** 7:14 50:4,16

**Dusk** 64:17

**duties** 48:21

---

**E**

**earlier** 21:23 36:18

**early** 21:22

**east** 39:11 40:16 82:16 83:3 90:21,24 91:2

**eastbound** 20:11 72:18 82:16 86:8 90:18

**ecstasy** 59:2 60:12

**educational** 11:10,17 12:1,8 13:4

**employed** 51:21

**encounter** 7:23 53:13 61:6

**encountered** 74:21,23 75:4

**encrypted** 5:2,4

**end** 68:9

**enforcement** 14:1 48:18

**ENTERS** 6:22 50:1

**entirety** 87:15 93:23

---

**Alpha Reporting Corporation**

**Proceeding - August 18, 2020**

**error** 40:17 86:10

**Essentially** 4:22

**established** 70:20

**events** 7:22 88:3 90:17

**evidence** 19:11 38:22

**exact** 20:24 21:1 35:15
47:13 65:22 67:7 77:23

**EXAMINATION** 36:15
50:18 82:7

**examined** 7:14 50:16

**exceed** 55:21

**excuse** 84:12

**exhibit** 17:9 18:3,12
19:10,15,17 39:2,4,7
42:11,17,19 86:3

**exhibits** 83:24

**exist** 4:22 5:16,17,24
6:3

**exit** 75:13

**expedition** 91:20

**experience** 38:7,12
41:2 55:3,6 57:13,20
90:23

**experienced** 84:5
86:23 87:22

**expert** 43:6

**expired** 91:24

**explain** 71:16

**extremely** 47:4

**eyesight** 21:9 22:8

---

**F**

**face** 41:18

**facing** 87:9 90:19

**fact** 10:20 23:13 26:6
62:9 88:20,21 90:1,15,
16

**facts** 16:19 17:2

**factual** 84:7

**failure** 24:24 25:17
26:7

**fair** 8:7,9 31:2 44:22
45:2,3 72:10 77:21

**fairly** 19:2 84:11

**familiar** 11:23

**February** 7:24 9:9
15:10 16:12 19:4,20,23
21:11,13,20 43:17
51:3,19 61:6,21 64:11

**fight** 35:23

**figure** 70:16,17

**filed** 19:3 94:6

**filing** 86:13,16

**fill** 13:20

**filling** 13:12

**final** 49:4

**find** 92:12

**finding** 31:21 32:18
77:13

**fine** 84:2

**fishing** 91:20

**five-plus** 90:22

**Flicker** 32:13 59:11

**Flip** 41:15

**floorboard** 32:16
58:23 60:11

**follow** 47:11 83:12

**follow-up** 72:1,3

**foot** 48:8

**footage** 24:12,13,15
26:10,11

**forget** 63:17

**form** 13:20 42:16
59:22,23 86:2

**forms** 13:12,20 14:11
15:19

**forward** 84:4

**found** 31:18 32:4,6
58:20 77:10,11 81:20

87:16 91:21 92:24
93:18

**frame** 35:15

**free** 49:21

**Freeman** 4:6 7:24
15:16 25:20 26:16,20
27:3,17,21 29:12,16,
18,20,23,24 30:1,3
31:5,22 32:14,15,19
33:3,5,7,8,24 35:9,12,
23 36:1 41:22 42:1,12
45:13 52:1,5,13 53:13
54:4,7 58:15 59:5,17
60:4,7 61:4,6 76:11,15,
19,24 77:3,14 78:11,
13,24 79:13,14,17
80:4,10 81:1,23 82:2
84:10 85:20,23 86:14
87:14 92:9,17 93:3,12,
22

**Freeman's** 59:19

**frequency** 46:17

**front** 15:15 16:11,16
19:24 41:14,20

**fruitless** 5:22

**full** 20:6 79:6

---

**G**

**gauge** 63:2

**gave** 20:16 22:24 33:16
35:12 41:22 59:23
80:19 81:10 87:7
93:12,14

**general** 70:21

**generally** 72:7

**gentlemen** 9:2

**give** 12:23 46:11,18
49:6 60:3

**giving** 68:2

**good** 7:18,19 9:22
61:1,2 89:17 90:1
91:16 94:15

**government** 83:20
86:22

**government's** 4:7

**Grace** 72:24

**Gracewood** 56:16
66:2,3 73:7

**grant** 93:22

**granted** 87:15

**gray** 20:11

**grayish-brown** 59:1

**greatly** 90:17

**Greg** 4:16

**Gregory** 4:16

**guess** 21:14 34:9
35:14 51:16 71:16
81:21

**gun** 11:7

---

**H**

**Hale** 20:12 39:12,19,
20,21 66:20 67:2,3,5,6,
9,10 69:8 70:13 72:18
86:8 88:9,13,17

**half** 35:13 47:12 48:15,
17 65:21 78:4,6 89:6,
10

**Hang** 82:21

**happened** 44:19 46:9
70:3,6 93:1,4,7

**hard** 62:9

**Harris** 15:12,15 16:12,
16 19:24

**hear** 8:24 26:18 50:10
62:10 78:21 85:11

**heard** 83:5

**hearing** 4:5,17 94:4

**heroin** 60:13 86:4

**high** 11:19 12:4

**Honor** 4:12,15,21 5:21
6:13 7:10 9:1 17:4,5,7
18:2,7,13 19:9,13 25:3,
4 36:8,10,11 37:11,19
38:20,24 40:6 42:10,14

---

**Alpha Reporting Corporation**

**Proceeding - August 18, 2020**

44:4 45:17,20 49:5
52:12 60:19,21 63:19
70:19 71:5,23 73:2,24
81:12 82:18 83:14,22
84:3 86:12 87:10,12,
14,18,21 88:4,8,19,20,
21 89:7,11,16,21 90:4,
12,14 91:3,6,9 92:7,21
93:11,16,24 94:8,13

**hour** 20:13 22:4,18
34:11,13,15,17,18,24
35:12 40:23 65:11,12,
15 78:4,6

**hours** 20:10 21:12
35:19

**hundred** 54:15 84:12

**hundreds** 51:18 84:20

**hypothetically** 70:23

---

**I**

**ID** 18:4

**idea** 66:24

**identification** 17:9
18:3

**identified** 17:15 52:13
57:14 75:18 84:9

**identify** 18:3 52:4

**identifying** 75:14,15

**III** 5:6

**illegal** 93:17

**importance** 13:12,19
90:11

**important** 13:24 14:7,
10 67:14 68:7,8,22
69:12,16 70:22 71:19
72:2,3,9 88:4,7,13
90:8,9

**impossible** 88:19 89:2

**inadmissible** 93:20

**incident** 70:3 74:10

**included** 37:1

**including** 15:19

**incorrect** 69:22 70:4

**incorrectly** 70:17 88:3

**incriminating** 87:8

**indication** 22:17

**indiscernible** 9:13
16:2 24:5 28:8 32:8
34:20 62:1 67:16 71:8
78:14

**individual** 4:24 52:4,
10 76:22 84:19

**individuals** 54:14
79:23 84:11,14

**inform** 88:2 91:13

**informants** 5:9

**information** 4:9 8:14
9:6,13 10:1,2 46:19
89:24 90:2

**informed** 4:18 56:8
58:22

**initial** 34:7

**initialed** 60:1

**initiate** 56:19

**initiated** 56:17

**inquire** 63:19

**intending** 86:10

**intention** 40:3,12,14

**intercepts** 5:7

**interrogating** 93:10

**interrogation** 34:13
81:10 93:10

**INTERRUPTION** 10:4

**intersect** 70:14

**intersection** 52:24

**intersections** 88:11

**interview** 34:16,23
35:9 80:10

**interviewed** 80:4

**interworkings** 43:13

**introduce** 38:21

**investigating** 69:19

**investigation** 6:4

**involving** 51:24

**issue** 24:21,24 25:16

**issued** 22:12 36:18,21
44:20

**issuing** 24:3

**items** 9:6

---

**J**

**J-O-S-H-U-A** 50:13

**job** 12:3 86:23

**John** 5:1

**Johnson** 14:20 22:4
39:18,19,21 53:1,16
61:23 66:13,19 67:5,6,
7,11 69:6 70:12 72:15
73:6 82:10,15,17 83:2
86:9 88:8,9,12,15

**Joshua** 49:24 50:3,12,
15

**Judge** 15:15 16:16
17:11 19:24 94:11

**judges** 14:7

**judicial** 15:11 16:11
19:4 40:5,12 86:11
88:2,16

---

**K**

**K-E-N-T** 6:18 7:8

**Kafahni** 61:3

**Kent** 6:18,22 7:1,7,13,
18 8:12 14:15 17:12
20:10 36:17 42:22
45:24 53:4 58:14,22
62:17 84:23 86:13
88:15 89:18 90:20
92:13

**Kent's** 6:10

**kind** 38:12 70:14

**knew** 92:9,10

**knowing** 86:1

**knowledge** 22:10,14,
19 24:18 30:10,11 82:1

---

**L**

**Lastly** 45:10

**late** 64:8

**law** 14:1 38:3,4

**lead** 60:4

**leading** 37:12 44:4,5
82:19 83:4

**learned** 12:21,24

**led** 55:15

**left** 55:24

**left-hand** 53:15 56:2

**legal** 87:3

**length** 47:12 48:8,10,
11 65:21 89:7,10

**lengths** 48:9

**lengthy** 35:16

**lesser** 38:10

**license** 8:12 10:1,13,
16,20 38:4 89:11,17,24
91:15,24

**lie** 93:13

**light** 64:15

**lights** 56:14,17,20
66:12,16 73:11

**limit** 53:18 54:24 55:21

**listed** 40:23

**literally** 88:19 89:2

**locate** 85:21

**located** 32:15 52:19
58:21,23

**location** 44:13 46:11
59:3 70:15 72:9

**locations** 32:7,12
41:24

**long** 50:24 68:10 77:9,

---

**Alpha Reporting Corporation**

**Proceeding - August 18, 2020**

24 78:1 80:11,17,22,24 81:9 93:11

**longer** 34:17 80:12 85:8

**looked** 18:18

## M

**made** 22:21 40:15 53:22 55:24 59:7 87:6

**magistrate** 40:4

**maintain** 47:8

**make** 8:20,23 9:4 17:12 50:10 54:1,17 56:23 59:24 60:14 62:7,12 84:2,24 87:19 93:16,17,18,19

**makes** 86:1

**making** 23:4 24:17

**marijuana** 28:19 29:1, 9 37:10 38:6 57:9,10, 21 58:1,21 75:10,12,18 85:18 92:12

**marked** 17:8 19:17 24:5,8 39:4 42:11,19

**Martavius** 7:24 52:1,5 61:4

**mask** 62:8 78:20

**masks** 8:21

**Mason** 22:11 24:17,21 25:19 26:21 27:2,10,21 28:14,17,18,22,24 29:5,9,11 30:12,18 31:6,22 32:14,19 33:2, 12,14,16,19,22 34:3,16 36:19,22 37:17,24 38:22 57:1,3,5,15,24 58:5 74:21,23,24 75:4, 11,23 77:14 78:11 79:10 81:17 91:11 92:9,11

**Mason's** 92:10

**match** 55:17 56:4 84:24

**matter** 4:5 23:13 67:3 68:12,15 93:7,8

**MCIC** 57:16

**means** 89:12

**meet** 12:7

**member** 61:18

**memory** 25:13

**Memphis** 4:19 24:2 43:4 50:23 51:5,12,21 84:6

**mic** 8:18,23 50:9 63:10, 11,12

**microphone** 10:4 78:18

**middle** 4:6 6:9 29:3

**miles** 20:12 21:2 22:4, 18 40:23 65:11,12,15

**mine** 81:1

**minutes** 31:1 39:13 71:21 77:22 78:3,5,7,8 79:3 93:7,8

**Miranda** 92:19

**Mirandize** 33:2

**Mirandized** 32:13 33:1,3,4 59:20 87:6

**Mirandizing** 33:7

**misdemeanor** 38:21

**mislead** 40:19 86:10 90:13

**misleading** 72:5,6

**mistyped** 40:15

**model** 54:17 84:24

**modified** 50:5

**moment** 25:3 35:11 73:2

**money** 60:14

**month** 14:16 21:15

**morning** 7:18,19,22 61:1,2,5

**motion** 87:1,10,15 93:22

**motions** 83:24

**move** 18:11 19:10 50:8 72:11

**moving** 64:23

**MPD** 5:10,23 51:1

**multiple** 41:24 87:1

## N

**narcotics** 57:23 58:2 59:4 60:9,12 79:16

**narrowed** 71:24

**narrows** 70:14

**nature** 5:5 45:1

**necessarily** 68:12

**needed** 75:5 92:22

**night** 52:5,17 62:16,20, 22

**Nissan** 20:11 22:11,21 54:19 84:24

**Nkrumah** 4:8,12,15 5:20,21 6:2,9,13,18 7:10,12,17 8:22 9:1,3, 22,23 10:18 16:10 17:4,7,17,21 18:2,6,9, 13,17,24 19:9,19 24:9 25:3,8 28:13 35:4,8 36:7 37:11,19 38:24 40:6 42:14 44:1,4 45:20,23 49:2,13 60:21,24 61:3 62:15 63:19,21,22 68:6 71:3, 4,7,11,18 72:13 73:2,4 74:3 79:2 81:12,14 82:4,18 83:21,22 87:11,12,14 94:13

**normal** 12:10 44:11 46:1 89:18,21

**notes** 6:7 69:19,22 70:4

**notify** 23:4

**notifying** 80:13

**number** 17:9 19:10 21:4 42:23 45:4

## O

**O'CONNOR** 5:1

**oath** 7:2 16:15,19

**object** 71:23

**objection** 19:12,14 37:11,19 38:23,24 39:1 40:6 42:13,14,15 44:1, 3 70:19 82:18 83:4

**observation** 45:10

**observe** 22:2 58:19

**observed** 20:11 21:7,8 63:24 64:4

**obtain** 5:11

**occupants** 58:12

**occupants'** 26:7

**occupation** 50:21

**occurred** 30:21 34:5,6 88:4 90:10,11,18

**occurring** 43:20

**OCU** 4:23 5:16 48:20

**OCU's** 5:5 43:13

**offense** 68:11,12,16 71:20 72:4 90:10,11

**offenses** 38:10

**office** 32:7,12 34:18

**officer** 4:20 5:12,23 11:13,14 12:11 41:2 43:3 48:14,16 50:22 63:8 71:12 78:17 84:18,22 88:5

**officer's** 6:6

**officers** 14:1 23:19 84:5 85:13 86:6,23 87:23 88:14 90:7,13, 15,22,24

**officers'** 90:16 91:22

**on-the-street** 12:17, 24

**opposed** 91:6

**Proceeding - August 18, 2020**

oral 81:6

order 48:24 63:2 65:9
89:1,7 92:22 93:16

orders 5:8

organized 23:13 51:4,
21 61:19

original 19:2

originally 39:15

overhear 27:13

overlap 39:19

Overly 4:23

overruled 83:5

owning 80:7

---

**P**

P.M. 94:18

pace 47:5,21 48:24
53:20 55:11 88:19
89:3,7

paced 65:6

pacing 41:10 46:22
47:1,7,24 56:6 65:14,
17,23 89:12

paragraph 20:6

part 48:17 51:5 84:20

participant 59:13

participated 51:17

parties 94:7

partner 26:19 27:2,7,
10,20 28:14,21,24 29:8
31:11,15 33:3,4,20,24
41:10,22 46:24 53:5
56:7,17 58:8 62:17
73:22 76:14,16,18,24
77:11 79:20

partners 33:21

pass 17:11 18:15 60:19

passed 17:20 25:6
35:13,20 36:13 64:19
77:22 93:16

passenger 27:5 31:13,
17 32:16 53:17 54:6
58:9,15,24 84:10

past 64:5

patrol 23:21 24:5,8
61:22 62:20 76:6

PDA 10:17,20,24 57:15
75:20,21,23 81:21

people 45:5 54:22
69:18

people's 15:6

percent 54:15 84:12,
14

period 26:17 34:6
35:16

person 45:1 86:18

phonetic 4:23

piling 38:13

place 7:1 41:18 77:3

placing 39:24 40:3

plain 21:8 22:8

plain-clothes 11:8

plan 58:2

planned 86:4

plate 8:13 10:16 89:11,
17,24 91:15,16

plates 10:1

point 26:15 29:8 32:14
39:21 52:7 54:23 56:3,
13 57:12,24 66:19,22,
24 68:13 69:4 76:23
79:14,18 85:19 88:10

pointed 29:2

pointing 52:10

police 4:19 11:13,14
12:9,10,12,15,16 14:11
24:2 41:2 43:4 48:14,
16 50:22 51:5,13,22
84:6 87:22 88:5 90:23

policies 86:6

policy 23:19,21 43:10

PORTION 35:7 71:15

position 64:22,23

positively 84:9

possession 36:5 38:5
92:11

possibly 34:19,23

practice 43:16,18
44:11 46:1,5,11 89:19,
21

practicing 5:14

precinct 32:21,24
92:18 93:9

presentations 94:3

prior 41:11

probable 85:19 86:20
91:7

probation 86:15,17

proceedings 9:19
10:10 35:3 42:24 43:7
62:6 63:7 94:17

process 80:18

produce 5:18

professional 11:3

proof 83:18,21

properly 89:7

proposition 90:14

prosecution 87:19

prosecutor 15:23 16:8
17:10

providing 42:7

provision 86:16

pull 8:18,19,23 63:12
85:5

pulled 47:11 53:20
56:21 72:20 73:11
74:15 84:17 90:2,3

purpose 87:3

put 18:15,19 21:2,4
40:14,15 41:4 70:17,20
81:9

putting 93:5

---

**Q**

quarter 48:8

question 8:3,5,8,10
9:21 10:13 35:5 40:7
49:4,14,18 61:9,11,15
67:20,24 68:5,21,22
71:6,7,12,13,24 72:1,7,
10,12 82:13,22,24

questioned 78:11
79:4 92:3

questioning 27:20
29:18,23,24 70:22
76:14,19 92:15

questions 7:22 27:22,
24 28:2,5,11 36:7,18,
19 40:7 42:23 45:16
49:2 61:5 74:24 81:15
82:4 83:13

quick 80:13,18

quickest 80:16

---

**R**

R-E-D-D-I-N-G 50:13

radar 15:2,5 62:22 63:2

radio 43:19 73:14,17,
19,22 89:19

radioed 73:16,20

ran 10:16,24 53:23
57:14

reach 12:7

read 25:9 80:2 86:2
89:11,14 92:19

readily 81:3

reading 37:20 93:9

READS 35:6 71:14

rear 32:16 57:19

reason 22:24 23:3
25:22 44:23

reasonable 47:16,17
49:7 91:8

---

**Proceeding - August 18, 2020**

reasons 14:16 26:2

recall 36:19,23 37:16, 22,23 38:15 39:12,24 41:10 45:7,9 51:24 54:17 58:7 65:22 73:18,19,20,21 74:2 81:24

receive 13:3 94:3

received 89:24

recognize 41:16,17

recollection 37:23 93:2

recommendation 94:6

record 7:5 9:19 10:10 18:20 35:2 50:8 52:8, 13,14 62:5 63:6

recorded 9:7 10:3,14

recording 23:8,11 24:10 26:12,14 74:9 90:5,6

recordings 4:11,22 5:2,5,10,15,24 6:3 42:24 43:7,13,23 74:12

recovered 60:10

RECROSS-EXAMINATION 45:22

Redding 20:11 49:24 50:3,13,15,20 61:1 82:9 88:6 89:9 91:10 92:14

redirect 36:9,15 82:5,7

referring 82:15

reflect 19:2 52:14

reflection 93:3

reflects 52:13

refresh 25:12 37:22

refresher 12:20,23

registration 37:5,18 38:3 56:8,9 85:7

registrations 89:22

regular 5:10 48:21 90:23

released 94:10

relied 14:1

rely 14:7,13 70:9

remember 16:1,7 28:4 33:13,18 35:15 46:9 47:13 64:18 73:8,9,16

remove 58:12

removed 58:16

repeat 9:21 35:5 67:19, 22 71:6,7,11,13 78:23

rephrase 37:13,14 40:8

report 70:18,21 71:1 94:6

reporter 16:6 35:4,6

reports 13:24 14:4 70:10,23 91:5

request 9:4,10,12 17:4,8 49:23 83:17

requested 10:1,2 35:7 71:15

REQUESTS 6:16 9:14 16:3 24:6 28:9 32:9 34:21 62:2 67:17 71:9 78:15

requirements 11:11, 15,17,24 12:2,8

responded 75:8

RESPONDS 67:21

response 5:20 9:5

rest 26:1

resume 7:1

RETAINED 19:18 39:5 42:20

retrieving 79:9

revoked 38:5

Rhonda 15:11

riding 91:23

rights 42:2,7,12,16 59:23 60:3,5 80:2,13 81:10 85:24 86:1,2 87:7 92:20 93:9

Road 20:12 39:12,20

room 81:10

roughly 55:20

route 69:2

run 9:10 10:20 81:24 82:2 89:22

running 8:12 15:1 56:7 62:22

___

**S**

safe 61:13

satisfied 5:19

school 11:19 12:4 15:7

seal 5:7

search 30:21 31:9 34:12 58:2,11 59:8 77:19,21 79:6 85:19 86:15,22 87:3,16 92:8 93:6

searched 30:19 31:11, 13,15 58:17 79:5 86:19

searching 31:3,17 77:6,9

seat 25:20 26:7,10 30:5,8 37:8 38:4 45:11, 14 53:17 54:6,8,11,14, 22 58:24 84:15

seated 50:6 63:12

sections 88:10

sell 60:14 86:4

send 44:17

separate 53:8

Sergeant 4:23

set 64:18

sets 21:19

severe 38:8

Shelby 5:14 15:12 88:16

shirt 52:9

short 26:17 34:6,10

shortly 30:21 34:5

show 17:10

showed 28:24 53:21, 24 57:15

side 27:5,7 31:11,12, 13,15,17 32:16 53:15 74:19

signal 25:1 53:23 90:5

signaling 22:22

signals 24:11,17 25:17 85:4 92:2

signature 18:18,19 19:6

signed 17:1,13,22

signs 72:23 73:6,8,9 82:10,16 83:2,7,9 89:2

silver 54:19

sir 7:4,9,11 8:2 16:9 17:18 20:8 21:10 25:5 50:6,14 51:14,23 52:2, 6,11 53:7,12 55:1,6,10, 13,23 56:2,12 57:11 58:3,13,18 59:6,15 60:6,18,22 61:2,8,12, 17,20 62:18,21,24 63:3,20 64:3,7,10,12, 15,21,24 65:7,12 66:8, 14 67:23 68:24 69:14, 17 70:1,8,12 72:17,19, 22 73:13 74:8,18,20,22 75:7,16,20 76:1,4,7,10 77:2,5,8,12,15 78:2,10 79:8,12 80:1,3,5,9,21 81:5,8,11,13,16,19,22 82:3 83:15 87:13 94:1

sitting 14:23 29:12,15 45:12 52:20,24 59:5 64:1 82:11 84:9 85:22

situation 4:10 44:10 45:8,9

smartphone 10:21

solid 85:10

someone's 63:2 68:11

sort 13:6

sound 87:19,20

**Proceeding - August 18, 2020**

**South** 32:13 59:11

**southbound** 14:23 90:20

**Sowell** 9:16 18:14

**spacing** 89:12,13

**speak** 8:22 33:11 62:8, 13 78:17 85:16

**speaking** 5:21 27:17 33:13,15,18,22,24 34:2 76:20,21

**specific** 16:1,7 45:7,9

**specifically** 82:15

**speed** 15:6,7 20:19,23, 24 21:1,6 48:18 53:18 54:24 55:17,18,19,21 63:2 88:23 89:14

**speeding** 14:17 22:12, 13 23:3,7 24:19,21 36:22 38:10,17 55:15 84:19 85:7 88:18 91:15 92:1

**speedometer** 89:1

**spell** 7:5 50:7

**spoke** 4:19,20 31:22

**spoken** 15:22

**squad** 31:7 57:19

**stand** 5:23 6:21 7:2 49:9 50:2,6,9 63:9

**standalone** 15:5 63:2

**standing** 64:22

**start** 68:2,9

**started** 77:6

**starting** 20:6 64:13,16

**state** 5:7 7:4 50:7 78:24 86:14,17

**stated** 20:4,9 27:9 28:18 46:24 47:2 61:18 65:6 66:17 74:15 75:9, 12 81:17

**statement** 33:17 35:12 41:21 42:7,12,16 59:14,19 60:3,8 79:15 80:15,16,19,20 81:6

86:3 87:4,8 92:19 93:19

**statements** 59:12 80:14 87:17 92:24 93:21

**States** 4:5,9 83:19

**stating** 16:19 60:2

**station** 34:12 36:4 77:17 79:22,23

**stayed** 47:14,16

**STENOGRAPHER** 6:16 9:14 16:3 24:6 28:9 32:9 34:21 35:2 62:2,5 63:6 67:17,21 71:9,14 78:15

**step** 49:21 56:10 57:13,14,18 83:16

**sticker** 18:15

**stipulate** 6:3

**stood** 75:22

**stop** 23:5,8,11 26:3,15 30:22 31:1 34:7,12,19, 24 35:11 41:11,23 43:17,19,23 44:16,19 45:4 51:24 52:18 56:11 59:7 60:16 72:23 73:6, 8,9 82:10,16 83:2,7,9 84:8,16 85:1,10 86:5 87:2 89:2,20 91:7,19, 20,21 92:8 93:4,17,19

**stopped** 4:6 26:20 44:23 52:5 77:20 78:8 85:9 91:14 92:5

**stopping** 14:17 23:1 25:23 26:6 27:1 46:2

**stops** 51:16 56:21 84:21

**strapping** 11:6

**street** 13:10 14:20,23 22:4 32:13 39:17 47:5, 22 61:23 63:24 64:1 66:1,13,15,19,23 67:9, 10,12,15 68:12,15,19, 23 69:4,6 70:13 72:15, 18 73:6 82:12 83:3 88:12,13,20 89:3,4,5

**streets** 68:8 69:1 82:11 83:6,8 88:7,8 90:19

**Strike** 26:24 66:18

**subject** 86:15,18

**submit** 89:21 92:21 93:17

**subpoena** 5:23 94:9

**substance** 59:1 80:7

**substantially** 84:7

**summary** 44:19

**sun** 21:19,23 22:3 64:18

**supported** 91:7

**suppress** 92:23 93:21

**suppressed** 87:17

**suppression** 4:4

**surrounding** 7:23 61:5

**suspended** 38:5

**suspicion** 91:8

**swear** 19:21,24 20:1

**sworn** 7:14 50:4,16

---

**T**

**tag** 65:19 91:24

**tags** 53:24 56:4,18 84:23 85:1

**takes** 11:10 69:23 70:1

**taking** 16:18 32:24 59:13,19 76:5 93:5,8

**talk** 52:17 80:14

**talked** 78:24

**talking** 27:10 29:16 48:8 58:9 76:21 87:22, 23

**taught** 13:11,19

**team** 46:16,17

**techniques** 13:5

**telling** 70:10 91:9,22 92:6

**testified** 7:15 14:16,22 15:1,4 20:19 22:20 25:19 27:9 46:21 48:12,17,20 50:17 62:16 71:19,21 73:10 74:13 75:11 84:6,18 85:14 88:6,15,16 89:9, 16,18 90:4,15,20 91:6, 10 92:7 93:11

**testimonies** 91:4

**testimony** 4:6 19:17 20:16 22:2 30:6 39:4, 15 42:19 65:8 66:10 68:18 72:14 73:5 85:12 86:11 90:17 92:16

**that'll** 9:22

**thing** 8:17 10:15 23:22 57:8 85:15 91:11,12,17

**things** 5:3,6 13:5,11 37:2

**thinking** 70:5,7,9

**thought** 18:22 83:5

**thousands** 51:18 84:20

**ticket** 24:16,19,20,21, 24 25:16 90:1

**Tillman** 66:23

**time** 6:8 7:20,21 17:7, 10 19:9 21:18,19 23:15,16,17,20 24:2 26:17 27:16 28:21 30:3 32:3 34:6 35:11,15,16 38:20 43:13,17 46:7,14 51:22 52:21 53:6,7 56:15 58:8,10 64:18 73:16,22 76:8,11,17 77:20,23,24 78:1 79:8 86:15 88:4 93:1,2,3,15

**times** 49:8

**title** 5:6 51:3

**today** 70:11 72:14 85:12 88:15 94:5

**told** 56:17 75:17 79:20

**Alpha Reporting Corporation**

**Proceeding - August 18, 2020**

top 85:6 86:12

traffic 23:5 30:4 34:19, 24 38:9 41:11,23,24 43:17,19,23 44:15,19 45:4 51:16,24 52:18 56:11 59:7 60:16 84:8, 20 85:10 86:5 91:19

traffic-stop 44:10

training 12:17 13:1,4, 9,10 41:1 48:18 55:2,6 57:12,20 86:7

transcript 94:4

transport 34:12

transported 36:4 59:11

traveling 20:12 22:4, 17 39:16 40:15 53:16 54:23 55:18,20 72:15 82:16 83:3 88:24 89:15

troubling 87:21,24 91:4

true 16:20 33:12

turn 24:11,17 25:1 36:22 38:17 47:18 56:1,2 66:5,12 67:5 73:11 82:12 90:5 91:16 92:1,2

turned 56:16 62:9 66:16 92:2

turning 25:17

turns 22:21 47:18 53:22 66:19 67:6 85:3, 7

typed 80:15,20

typers 80:16

typographical 40:17 86:10

**U**

ultimately 85:17

undercover 5:9

undermines 85:12

understand 8:1,4,5 42:4 50:10 60:5 61:7, 10,11,14 70:21

understanding 5:15

understood 8:10 60:1, 2 61:15 87:7

uniform 11:7,8 23:21

unit 23:14,19 61:19

United 4:5,9 83:19

unmonitored 9:10

unrecorded 9:11

unusual 86:5

upset 87:8

utilizing 53:22

**V**

valid 87:3

Vandalia 14:23 53:1 61:23 63:23 64:1 66:1 69:3,8 72:23 73:7

vehicle 15:7 20:20,23 21:7 22:3 23:22 25:23 26:6,16,20,21,22 27:1, 2 28:15,18,22 29:1,13, 15 30:1,13,15,19 31:4, 5,6 32:4,17 37:5,18 38:3 39:16,24 40:3,11, 14 41:11 44:14,23 45:4 46:2,12 47:1,5,7,14,18, 21 48:1,4,6,24 52:20, 22 53:9,10,11,15,17, 21,23 54:1,4,16,18 55:8,12,15,16,18,20,24 56:4,5,7,9,18,20 57:7, 8,18 58:2,10,11,16,17, 23 59:8 62:19,20 65:6, 9,10,16,17,23 66:11 72:15,20 74:5,6,16,19 75:2,3,5,13,23 76:3,5, 12,24 77:3,6,10,20 78:9 79:5,6 80:7 84:10, 16,17,23 85:2,5,9,18, 19 86:19 87:2 88:23,24 89:3,8,11,15 90:3 92:4, 10 93:5,6

vehicle's 55:17 56:7,8

vehicles 23:23,24 24:4 46:22 53:8 89:4

verbal 80:14,19

verified 75:24

verify 10:19

verifying 76:2

versus 4:5

vicinity 61:22

violate 5:8

violation 36:22 37:6, 18 38:3,4 85:6 91:20

violations 24:11 30:4 38:9,17 41:24

voluntary 86:1

**W**

Wait 16:5

waited 85:7

waived 60:3

waiver 42:7 59:23 86:1

waives 85:24

wanted 4:8

warrant 57:16 81:17, 23 82:2 85:17

watch 44:5

wear 23:14,19 26:7

wearing 23:20 25:20 26:10 30:5,8 52:7 53:17 54:8,10,14,22 84:15

west 40:15 90:21 91:1, 2

westbound 14:20 39:16 53:16 72:15 83:3 86:9 90:18

whatnot 86:19

winter 21:15

wintertime 21:12,22, 24

witnesses 4:7 84:4

word 22:15 90:7

words 91:22

work 4:14 59:22 63:10 94:6

worked 46:17 51:4

would've 8:9

written 10:15 41:21 42:6 59:22

wrong 9:24 86:24

**Y**

y'all 4:13 8:24 23:14 26:20 53:8,9 84:1

years 5:13 11:22 48:13,15,17 51:2,10, 11,12,15 90:22

yield 83:9

**Z**

zone 15:7 20:13 21:3