**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                                                 **Case No. 2:20-cr-20058-JTF**

**MARTAVIUS FREEMAN,**

        **Defendant.**

---

**REPORT AND RECOMMENDATION ON DEFENDANNT MARTAVIUS FREEMAN'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Martavius Freeman's Motion to Suppress. (Docket Entry ("D.E.") #23). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #24). The Magistrate Judge held an evidentiary hearing on the instant motion on August 4, 2020 and August 18, 2020. For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

    **I.   Introduction**

On February 20, 2020, Defendant was indicted for one count of unlawfully, knowingly, and intentionally possessing a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, with the intent to distribute in violation of Title 21, United States Code, Sections 812 and 841(a)(1) .

1

On June 26, 2020, Defendant filed the instant motion seeking suppression of "any and all physical evidence whether tangible or intangible," "any statements or admissions alleged to have been made by Mr. Freeman," and "any and all observations of law enforcement officers and any other tangible or intangible evidence obtained during or as a direct or indirect result from the search of the automobile stop of a vehicle that Mr. Freeman was riding in as a passenger . . . on February 2, 2020 on Crystal Road in Memphis, TN." Defendant asserts that he has standing to challenge the constitutionality of the stop and the ensuing detention and that that the vehicle in which he was a passenger was stopped without reasonable suspicion or probable cause in violation of the Fourth Amendment.

On July 13, 2020, the Government filed its Response to Defendant's Motion to Suppress. The Government argues that the traffic stop was based upon probable cause, that the scope of the traffic stop was permissible based on evidence of more extensive criminal conduct, and that Defendant's oral and written statements were lawfully obtained. With regard to the stop specifically, the Government asserts that it was was supported by probable cause because neither the driver nor the passenger were wearing seatbelts, the vehicle was speeding, the driver failed to utilize a turn signal twice, and the vehicle's tags were registered to another vehicle. The Government additionally filed two exhibits in support of its Response: a Probation Order issued by the State of Tennessee Board of Probation and Parole in the case of State of Tennessee v. Martavius Freeman (the "Probation Order" (D.E. #27-1) ("Probation Order"); and, the Affidavit of Complaint initially filed against Defendant in the Criminal Court of Shelby County, Tennessee and pertaining to the offense now before this Court (D.E. #27-2) ("Affidavit").

2

**II. Proposed Findings of Fact**

On February 2, 2019, Detectives Chris Kent and Joshua Redding of the Memphis Police Department ("MPD") were assigned as partners to the Criminal Apprehension Team of the Organized Crime Unit ("OCU"). (Transcript of August 4, 2020 Hearing ("Aug. 4 Tr.") at 4:21-22, 5:4-24. 7:19-22; Transcript of August 18, 2020 Hearing ("Aug. 18 Tr.") at 50:12-51:8, 51:19-23, 61:18-20, 62:16-18). Their duties included conducting traffic stops and apprehending individuals with warrants. (Aug. 4 Tr. at 5:25-6:4). Detective Kent has been with MPD for five years and had performed "[t]housands" of traffic stops "at least." (Aug. 4 Tr. at 5:17-18). Detective Redding has been with MPD for five years and estimates that he has performed "hundreds if not thousands" of traffic stops. (Aug. 18 Tr. at 50:24-51:3, 51:9-18).

On that date, Detectives Kent and Redding were on patrol together on Vandalia when they observed a silver Altima (the "Vehicle") driving down westbound on Johnson with two individuals in it—one in the driver's seat and one in the passenger's seat. (Aug. 4 Tr. at 7:3-10, 8:10, 9:18, 14:20-24; Aug. 18 Tr. at 52:23-53:17, 54:16-20). Detectives Kent and Redding observed that neither individual was wearing a seatbelt, which is a violation of traffic law. (Aug. 4 Tr. at 7:9-10, 8:12-18; Aug. 18 Tr. at 53:16-17. 54:7-15, 54:21-55:6). Detective Redding testified that he was a "[h]undred percent certain" that both individuals were not wearing seatbelts. (Aug. 18 Tr. at 54:13-15). Detective Kent also testified that he was "very certain" that neither occupant was wearing seatbelts. (Aug. 18 Tr. at 45:10-15).

Detectives Kent and Redding also observed that the Vehicle appeared to be speeding. (Aug. 4 Tr. at 9:8-15, 14:15-19; Aug. 18 Tr. at 53:17-18; 54:21-55:6). Detective Redding, who was driving, pulled behind the Vehicle and "attempted to pace" it. (Aug. 18 Tr. at 41:10-12, 46:21-49:1, 53:20-21, 55:7-13, 62:19-21, 64:19-65:23). Detective Redding explained that he did so by

3

"attempt[ing] to match the vehicle's speed" with his own car. (Aug. 18 Tr. at 46:21-49:1, 55:14-20). Detective Redding determined that the Vehicle "showed to be going around 45 in a 25." (Aug. 18 Tr. at 53:21-22). However, the officers were not utilizing radar to determine the Vehicle's exact speed, and Detective Kent testified that he had no other evidence of the Vehicle's speed. (Aug. 4 Tr. at 15:1-9; Aug. 18 Tr. at 22:14-19, 62:22-63:3).

Detective Redding turned behind the Vehicle while Detective Kent was "running the tag." (Aug. 4 Tr. at 7:11, 7:19-25, 8:19-9:4; Aug. 18 Tr. at 52:17-22, 53:23-24, 55:7-8, 56:3-9). Detective Kent determined that the tag was registered to a different Vehicle. (Aug 4 Tr. at 9:5-7; Aug. 18 Tr. at 53:24-54:1). Detective Kent was asked whether he had any evidence to verify that he ran the Vehicle's tag on his PDA. (Aug. 18 Tr. at 10:19-22). Detective Kent testified that he did not. (*Id.*)

As Detectives Kent and Redding continued following, the Vehicle turned left onto Gracewood and then right onto Crystal. (Aug. 4 Tr. 9:19-20, 9:23-24; Aug. 18 Tr. at 24-56:2, 56:15-16). No turn signal was utilized on either turn. (Aug. 4 Tr. at 9:23-10:1, 22:20-23:2; Aug. 18 Tr. at 53:22-23). Thus, Detective Redding activated the blue lights, and the Vehicle stopped. (Aug. 4 Tr. at 9:20-22; Aug. 18 Tr. at 56:13-21, 66:12-14).

Detective Kent testified that it is common practice to contact dispatch with the "location and a brief description of the vehicle" but that he believes he did not do so on this occasion. (Aug. 18 Tr. at 23:3-6, 42:22-45:9, 45:24-46:20). Detective Redding also testified that he does not recall contacting dispatch. (Aug. 18 Tr. at 73:14-24).

Following the stop, Detective Redding proceeded to speak with the driver, who he identified as Carlos Mason ("Mason"). (Aug. 4 Tr. at 20-23; Aug. 18 Tr. at 56:22-57:3, 57:12-14, 74:16-22). Detective Redding asked him if there was anything in the Vehicle that they "need[ed]

to know about." (Aug. 18 Tr. at 27:19-29:757:4-7, 74:23-75:7). Mason advised that "the only thing in the vehicle was a little bit of marijuana." (Aug. 18 Tr. at 27:19-29:7, 57:7-11, 75:8-10). Detective Redding also "ran" Mason on his "PDA," which showed that Mason had an "active warrant, per MCIC [sic]." (Aug. 18 Tr. at 57:14-16). Detective Redding did not speak with Defendant at this time. (Aug. 18 Tr. at 58:4-6).

At the same time that Detective Redding approached Mason, Detective Kent "went up to the passenger side of the Vehicle" and determined that the passenger was Defendant. (Aug. 4 Tr. at 10:6-11; Aug. 18 Tr. at 54:4-6, 58:7-10). Detective Kent introduced himself, identified himself as an MPD officer, and asked him "where they were coming from," "where they were going," "[w]hat they were doing," "if he had ever been arrested for anything," and if he was "on probation or parole." (Aug. 4 Tr. at 10:14-17; Aug. 18 Tr. at 27:19-29:7). Defendant stated that "he had just began [sic] three years of probation for an old drug arrest." (Aug. 4 Tr. at 10:17-19).

As Detective Kent was speaking with Defendant, Mason "mention[ed] weed and motion[ed] to a bag of green leafy substance in the center console." (Aug. 4 Tr. at 10:20-25). While standing beside the Vehicle, Detective Redding then utilized his PDA to further identify Mason. (Aug. 18 Tr. at 75:17-76:1). Detective Redding placed the driver in custody in the back of the squad car first, and then Detective Kent and Detective Redding placed Defendant Freeman in the back of the squad car. (Aug. 4 Tr. at 10:25-11:4; Aug. 18 Tr. at 29:8-22, 29:20-30:2, 30:12-17, 57:18-22, 58:11-16, 75:11-16, 76:5-77:5).

The officers then proceeded to conduct a search of the Vehicle for "further narcotics" and "contraband." (Aug. 4 Tr. at 11:5-8; Aug. 18 Tr. at 30:18-20, 31:9-20, 57:20-58:3, 58:17-18). Detective Redding "located the marijuana" that Mason advised was in the Vehicle, and Detective Kent found "a bag filled with a gray hard substance consistent with heroin and a bag of bright pink

5

pills consistent with MDMA" in the "back passenger side floorboard" behind where Defendant had been sitting. (Aug. 4 Tr. at 11:9-16; Aug. 18 Tr. at 31:9-20, 58:19-59:6, 77:13-15). Detective Kent estimates that the search occurred "within three to five minutes" after the stop. (Aug. 18 Tr. at 30:21-31:2). Detective Redding states that he "did not know the exact time" between the traffic stop and the beginning of the search but states that it "wasn't a long time" and was "[m]aybe 10 minutes." (Aug. 18 Tr. at 77:19-79:8).

Detectives Kent and Redding testified that there is no dashboard or body camera footage from any point in the encounter. (Aug. 18 Tr. at 23:7-24:15, 26:9-14, 42:22-43:15, 74:6-14). Detective Kent testified that, while uniform patrol wore body cameras at that time, OCU did not. (Aug. 18 Tr. at 23:13-21). Detective Kent testified that only "marked patrol cars" had dash cameras. (Aug. 18 Tr. at 23:22-12).

Following the search of the Vehicle, Defendant and Mason were transported to an MPD office where Detectives Redding and Kent advised Freeman of his *Miranda* rights, which he waived. (Aug. 4 Tr. at 11:18-12:1; Aug. 18 Tr. at 31:21-36:6, 41:23-42:9, 59:9-60:6, 77:16-18, 79:22-81:11 & Exh. 3). Thus, Detective Redding took a statement from Defendant with Detective Kent present. (Aug. 4 Tr. at 12:2-4; Aug. 18 Tr. at 13-17). Detective Redding recalls that Defendant "advised that the narcotics that [were] recovered in the back floorboard," which he identified as "some ecstasy and some heroin," belonged to him and that he "had the heroin in an attempt to sell it to make money." (Aug. 18 Tr. at 60:9-14). Detective Kent recalls that Defendant "claimed ownership of the narcotics" and "intended to sell them for approximately $100 . . . a gram." (Aug. 4 Tr. at 12:4-9).

Later that day, Detective Kent made an Affidavit of Complaint before Judge Rhonda R. Harris of the General Sessions Court of Shelby County, Tennessee. (Govt's Resp. to Def.'s Mot.

6

to Suppress at Exh 2, filed at D.E. #27-2).  It stated that they first observed the Vehicle "east bound on Hale Road travelling approximately 45 MPH in a 25 MPH zone." (*Id*.)  On cross examination, Detective Kent was asked about the accuracy of the Affidavit. (Aug. 4 Tr. at 20:9-22:9).  Detective Kent testified that the Affidavit approximated the speed and that it stated that it did so.  (Aug. 18 Tr. at 40:22-41:12).  Detective Kent testified that the information in the Affidavit was not exactly the same as the testimony provided in the evidentiary hearing on the instant motion and that the Affidavit contained "typographical errors" as to the direction of the Vehicle and the street on which it was initially observed.  (Aug. 4 Tr. at 20:14-21; Aug. 18 Tr. at 39:10-40:21).  Detective Kent further explained that Hale Street and Johnson Street are the "same street" that "has a different name depending on which block you're on" and that Vandalia only crosses it at one point.  (Aug. 18 Tr. 65:19-72:19).

Ultimately, Mason was not issued a citation for speeding or for failure to utilize a turn signal; instead, he was cited for invalid vehicle registration, a seatbelt violation, driving while his license was suspended, revoked, or cancelled, and possession of marijuana. (Aug. 4 Tr. at 22:10-19, 23:7-25:2, 25:16-18, 26:9-14; Aug. 18 Tr. at 38:17-38:6 & Exh. 2).  Detective Kent testified that it is commonplace not to charge the "lesser offenses" in a situation such as this where there are "more serious charges."  (Aug. 18 Tr. at 38:7-39:2).

### III. Proposed Analysis

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.

Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id*.

### A. Standing

As a threshold issue, Defendant asserts that he has standing to raise his Fourth Amendment claims.[1] The Government does not dispute this issue, and it is well-settled that a passenger in a vehicle may challenge the constitutionality of a stop and the scope of an ensuing detention. *See Brendlin v. California*, 551 U.S. 249, 256-59 (2007). Accordingly, it is RECOMMENDED that Defendant has standing to raise these challenges here.

### B. Legality of Traffic Stop

Next, Defendant contends that the stop was not supported by either reasonable suspicion or probable cause. In order to effectuate a traffic stop, an officer must possess either probable cause of a civil traffic infraction or reasonable suspicion of an ongoing crime. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012), *reh'g and reh'g en banc denied*, (2012); *see also United States v. Dean*, 657 Fed. Appx. 503, 506 (6th Cir. 2016) (citing *United States v. Blair*, 524 F.3d 740, 748 (2008)); *United States v. Collazo*, 818 F.3d 247, 253 (2016). Here, the Vehicle committed multiple traffic violations: (1) speeding, in violation of Tennessee Code Annotated Section 55-8-

---

[1] This threshold question is referred to as whether Defendant has "standing," although the inquiry is in fact one "within the purview of substantive Fourth Amendment law." *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978). As courts nonetheless use the term "standing" to discuss whether the defendant may make this threshold substantive showing, this Court will do so as well.

152; (2) failure to wear seatbelts in violation of Tennessee Code Annotated Section 55-9-603; (3) failure to utilize a turn signal in violation of Tennessee Code Annotated Section 5-8-143; and, (4) failure to maintain valid vehicle registration in violation of Tennessee Code Annotated Section 55-4-101.  Thus, it is RECOMMEDED that these violations suffice to establish probable cause for the traffic stop.

### C.  *Scope of Detention*

Next, Defendant contends that, even if the traffic stop were constitutionally permissible, the scope of the ensuing detention was not.  "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984).  To assess the reasonableness of seizure, the court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

Specifically, a stop must "last no longer than is necessary to effectuate the purpose of the stop" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Everett*, 601 F.3d 484, 488-89 (6th Cir. 2010) (internal citations and quotation marks omitted). "'To detain a motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct.'" *United States v. Leonel Aguilera-Pena*, 426 F. App'x 368, 370 (6th Cir. 2011) (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (internal quotation marks omitted)).

Here, upon stopping the Vehicle, both Detective Redding and Detective Kent proceeded to identify the driver and passenger. It is well-settled that law enforcement officers "may validly request identification during an investigatory detention." *United States v. Latoya Marie Horn*, No. 6:08-02-DCR, 2008 WL 834364, at *13 (Mar. 27, 2008) (citations omitted).

Detective Redding then asked Mason whether he had anything in the Vehicle that the officers should know about, and Detective Kent asked Defendant what he was doing, where he had been, where he was going, whether he had been previously arrested, and whether he was on probation or parole. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *United States v. Leonel Aguilera-Pena*, No. 09-1535, 2011 WL 2173729, at *2 (6th Cir. June 2, 2011) (citing *Everett*, 601 F.3d at 496; *Johnson*, 555 U.S. at 333) ("A law enforcement officer does not violate the Fourth Amendment merely by asking a detained motorist extraneous questions so long as those questions do not unnecessarily prolong the detention, and the detainee's responses are voluntary and not coerced."). Here, there is no evidence that either of these questions measurably extended the traffic stop; instead, the record only reflects that both Mason and Defendant provided brief answers and that the length of time from the traffic stop until the search began was between three and ten minutes.

Detective Redding also performed a record check on Mason, which showed that he had an active warrant. A warrant check is reasonable and within the scope of an ordinary traffic stop. *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010); *United States v. Bell*, 555 F.3d 535, 541

(6th Cir. 2009). Once Defective Redding was aware that Mason possessed marijuana and had an active warrant, he had probable cause to search the Vehicle.[2]

At the evidentiary hearing, Defendant argues that the stop was nonetheless illegal for several reasons related to the strength of the evidence and the officers' credibility. First, Defendant argues that there was not sufficient corroborating evidence of the events leading up to and following the traffic stop because there was no dispatch call and no body or dash camera footage. (Aug. 18 Tr. at 90:4-11). Although this is accurate, the Court accredits the testimony of Detectives Kent and Redding, who testified to substantially the same facts supporting their determination that probable cause existed to stop the Vehicle and that they did not exceed the permissible scope of the investigatory detention.

Defendant argues that there is also no corroborating evidence regarding the speed of the Vehicle and that "it's literally impossible to pace someone on a city street." (Aug. 18 Tr. at 88:18-19:15). This is also contrary to the credible testimony of both Detectives Kent and Redding, both of whom testified that they were able to approximate the Vehicle's speed by pacing it.

Defendant argues that the failure to utilize dispatch to "run registrations" provides no corroborating evidence of "when they received the information that the license plate was no good." (Aug. 18 Tr. at 89:18-90:1). Again, the Court finds the testimony of Detectives Kent and Redding to be credible that Detective Kent ran the Vehicle's license plate while Detective Redding followed the Vehicle.

---

[2] At approximately the same time, Detective Kent became aware that Defendant was on probation for a drug offense. The record reflects that the terms of Defendant's probation included that he agreed "to a search, without a warrant, of [his] person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." Although such a condition may be commonplace, the record does not expressly reflect that Detective Kent was aware of the specific terms of Defendant's Probation Order at the time of the arrest.

Defendant additionally argues that the errors in the Affidavit are "troubling" because they "inform[ed] the judicial commissioner incorrectly about the events that occurred at that time." (Aug. 18 Tr. at 87:21-88:17, 90:12-91:8). The Court again accredits the testimony of Detective Kent who explained that these were unintentional errors. Detective Kent's testimony as to the error regarding the street name is particularly persuasive as the road is named Hale Street and Johnson Street on different blocks. Although Defendant asserts that these errors show that the officers did not "know where they're at," the Court finds that these errors are minor and do not go toward the basis of the determination that sufficient grounds existed for the traffic stop.

Finally, Defendant argues that the traffic stop "wasn't because of a traffic violation" but instead was a "fishing expedition" in hopes to discover illegal activity. (Aug. 18 Tr. at 91:9-92:6). Defendant states that his position is bolstered by the nature of the initial questioning of Mason and Defendant. (*Id*.) As set forth above, officers are permitted to make inquiries into matters unrelated to the justification for the traffic stop so long as those inquiries do not measurably extend the duration of the stop. As also set forth above, it is RECOMMENDED that the inquiries here did not do so. Accordingly, it is RECOMMENDED that the investigatory detention that ensued following the traffic stop did not violate the Fourth Amendment.

### D. Legality of Oral and Written Statements

Finally, Defendant does not argue that the oral and written statements provided at the police station violated his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). In fact, the record reflects that Defendant was advised of and waived his *Miranda* rights before being questioned. Instead, he asserts that they are fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). However, for any evidence to be considered fruit of the poisonous tree, the evidence must reflect that there was a "primarily illegality." Here, it has been

RECOMMENDED that no such illegality occurred.  Thus, it is further RECOMMENDED that Defendant's oral and written statements were lawfully taken.

### IV. Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress (D.E. #23) be DENIED.

**DATED** this 14th day of October, 2020.

> s/ Charmiane G. Claxton
> CHARMIANE G. CLAXTON
> UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**